**In re GRAND JURY PROCEEDINGS.**

**Appeal of CAUCUS DISTRIBUTORS, INC., et al.**

**Nos. 87–1026, 87–1270.**

United States Court of Appeals, First Circuit.

Jan. 9, 1989.

Decided March 29, 1989.

Rehearing Denied May 30, 1989.

Michael R. Smith with whom Roger E. Zuckerman, Zuckerman, Spaeder, Goldstein, Taylor & Kolker, Washington, D.C., Michael L. Altman, and Silverglate, Gertner, Fine & Good, Boston, Mass., were on briefs, for appellants National Democratic Policy Committee, Campaigner Publications and Fusion Energy Foundation.

Barbara A.H. Smith, Boston, Mass., with whom Davis, Robinson & Smith was on brief, for appellant Caucus Distributors, Inc.

Patty Merkamp Stemler, Dept. of Justice, Washington, D.C., with whom Frank L. McNamara, Jr., U.S. Atty., and Peter E. Gelhaar, Asst. U.S. Atty., Boston, Mass., were on brief, for the U.S.

Before CAMPBELL, Chief Judge, ALDRICH and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

These are consolidated appeals by four organizations associated with Lyndon LaRouche—Caucus Distributors, Inc. (Caucus), Campaigner Publications, Inc. (Campaigner), Fusion Energy Foundation, Inc. (Fusion), and National Democratic Policy Committee (NDPC)—from partial civil contempt judgments assessed against Caucus in the amount of $6,055,000 and against each of the other three contemnors in the amount of $5,110,000.

*Our earlier decision*

Since this is a continuation of the proceedings previously considered by us in *In re Grand Jury Proceedings*, 795 F.2d 226 (1st Cir.1986), we repeat our description of the underlying litigation:

The contempt judgments were imposed by the United States District Court for

the District of Massachusetts due to the failure of the appellants to cooperate with a grand jury investigation into possible credit card fraud by these and other LaRouche related entities. These organizations are suspected of obtaining hundreds of thousands of dollars in interest-free loans from credit card banks. The loans were allegedly obtained by fraudulently altering small credit card purchases or donations from persons interested in Lyndon LaRouche to reflect a charge for a large sum. The sums thus obtained were ultimately returned to the credit card bank *sans* accrued interest after the owner of the credit card informed the bank that the charge was not authorized.

*Id.* at 227–28.

Moreover, since a number of issues sought to be raised here are precluded by the arguments and holdings in that case, we summarize briefly what we then decided. An appeal from an initial contempt judgment (March 29, 1985) assessing the four contemnors a civil fine of $10,000 a day was dismissed as untimely; this ruling precluded appellants from pursuing their "sole argument," 795 F.2d at 229, against a liquidated partial judgment (April 22, 1985) of $70,000 covering their noncompliance from April 2, 1985 through April 8, 1985. We said, "Since appellants do not contest the actual contempt finding, their appeal of the April 22 judgment fails." *Id.* at 230. A second appeal, this one solely by Caucus, challenged a second liquidated partial judgment (November 22, 1985) of $150,000, covering noncompliance from April 9, 1985 to April 25, 1985. The two grounds asserted —defective service of process and the pendency of appeals from the judgments of March 29 and April 22—fell with our holding the appeal of the March 29 judgment untimely. The pendency of the appeal from the April 22 judgment, covering a different period of time, could not interfere with the second partial judgment.

The third appeal, also by Caucus alone, challenged a contempt judgment (January 22, 1986) fining it an additional $5,000 a day for failing to turn over index cards relating to fundraising activities. We described the controversy as follows:

> Grand jury testimony by the keeper of records had revealed that fund raisers working at Caucus offices around the country kept the names of potential and actual donors on index cards, along with various other information including amounts donated. This information was of particular interest to the grand jury in its investigation into the possible involvement of Caucus in the credit card overcharge scheme. The keeper of the records, however, did not turn these index cards over to the grand jury. He claimed that he could not turn the cards over because Caucus was not in possession of the cards. The cards were in the hands of the individual fund raisers, who allegedly considered themselves and were considered by Caucus to be independent consultants rather than employees of Caucus. The fund raisers claimed the cards as their personal property and asserted that both their first and fifth amendment rights could be infringed if they were compelled to turn them over. Caucus fully concurred in and supported the claims of the individual fund raisers.

795 F.2d at 232. The issue on appeal was whether there should have been an evidentiary hearing to allow Caucus opportunity to show that the index cards were personal documents. We held that, under the circumstances, where testimony from fundraisers would have merely repeated the assertions made in detailed affidavits and would likely have resulted only in further delay, the court did not violate due process in deciding the question "whether the cards were sufficiently involved in Caucus' business of fund raising so that they could be considered corporate documents regardless of their prior uses or ownership." *Id.* at 235.

*Events subsequent to our earlier decision*

Our decision was issued on July 3, 1986. Nothing had happened in the meantime, since the January 22, 1986 contempt judgment against Caucus, except an event unremarked by anyone at the time—the expira-

tion of the grand jury some time in January, 1986. The investigation apparently remained in limbo until June, 1986, when another grand jury was empaneled and resumed work on these matters.

Six days after our opinion issued, the government, on July 9, 1986, wrote both Campaigner and Caucus, referring to our decision and asking them to "produce a legitimate Keeper of the Records with actual knowledge of the records." There was no action forthcoming. On September 1, 1986 the government filed a motion for partial judgment seeking $6,055,000 from Caucus and $5,110,000 from each of the other contemnors, these amounts covering noncompliance through September 1, 1986. All appellants opposed the motion, claiming that they had complied with all they had been ordered to do.

On October 6, 1986 federal agents searched offices in Leesburg, Virginia, and in Quincy, Massachusetts. Subsequently, pursuant to its expressed intent to supply proof of noncompliance, on November 12, 1986 the government filed an affidavit by FBI Special Agent Martha Wilkes memorializing her personal undercover visits to the Quincy office of Caucus prior to the search and her review of index cards seized at Leesburg. The salient facts averred were:

—at Quincy she saw thousands of index cards, naming potential contributors;

—a Caucus employee told her the cards were used for fundraising and that "the organization" was "inputting" the index card information into a computer linked with another in Leesburg;

—on October 6, FBI and Secret Service agents searched "the contemnors' offices" in Quincy and Leesburg and seized thousands of index cards;

—her examination of many cards from Quincy showed notations, usually by more than one person, indicating their existence prior to February 1, 1985, the date of the subpoena being February 6;

—her review of a sample of cards from Leesburg showed notations to similar effect;

—the claim of Caucus, in its opposition paper, that individuals controlled the custody of the index cards and refused to turn them over was false because "the contemnor organizations had custody of literally thousands of index cards."

To this affidavit were attached seven of the cards seized at Quincy. The notations were difficult to decipher but two contained clear references to NDPC and two, possibly three, had references to Fusion.

Appellants moved for a stay, alleging the likelihood of prejudice because of then pending criminal proceedings. The court denied the stay on December 12, 1986, but gave contemnors twenty days in which to respond to the Wilkes affidavit. On the twentieth day, January 1, 1987, contemnors asked for an extension until January 9 to prepare their responses. But instead of responding, on January 9 Caucus and Campaigner noticed an appeal from the denial of stay. On January 19 Fusion and NDPC, in a supplementary memorandum, merely argued that they had produced a mass of documents and that "no one had ever contended" that the index cards had belonged to them. On February 26, 1987 the court, after concluding that nothing had been submitted to contradict facts set forth in the Wilkes affidavit, entered its contempt judgments.

### Analysis

A number of issues may be considered together. They encompass challenges to the procedure, impact and amount of the fines, the coverage of the initial contempt judgment, and the adequacy of the Wilkes affidavit. What these issues have in common is that they are affected, indeed profoundly controlled, by the history of these cases. A final issue is unrelated to anything that has been decided in the past: does an order for daily coercive fines for failure to produce documents have validity beyond the existence of the grand jury before which the documents were ordered to be produced?

Appellants advance the following arguments attacking the fines assessed by the district court: that the fines of five and

six-plus million dollars are excessive; that no particularized decisionmaking has taken place, *e.g.*, that there was no specific focus on the government's loss, no weighing of the degree of noncompliance or of the financial impact on the contemnors; that no periodic review has been undertaken of the appropriateness of the fines; and that there was no articulated basis for decision. To these can be added the claims that the initial subpoena did not specify "index cards" and that the Wilkes affidavit made no mention of Campaigner, Fusion, or NDPC and their custody of index cards.

■ All of these arguments might at one time have been worth making. But time and decision have preempted them. The excessiveness of the fines is not presently an available issue; the time to have complained was when the daily rate was set. *Cf. In re Grand Jury Witness (Arambulo)*, 835 F.2d 437, 443 (2d Cir.1987). And, as we have noted, not only was the appeal from that initial ratesetting judgment held to be untimely, but also the only challenge sought to be raised by that appeal was defective service of process. The current challenges—to the failure to make specific judgments about the loss to the government, the extent of noncompliance, the financial impact on the contemnors, the absence of periodic review or of an articulated basis of decision—all fall because of the lack of any prior, timely challenge. These are ideas trundled out for the first time on this appeal.

■ Appellants mount a parallel argument, claiming that the very size and supposed destructiveness of the fines assessed in the order of February 26, 1986, after the government had seized the index cards and some of them had been burned, after an indictment had been returned against Campaigner and Caucus, and after the investigation had ended, made the sanctions punitive, thus invoking all of the rights given a witness charged with criminal contempt. Such a claim overlooks prior history: the valid early assessment of the fines, contingent on continued refusal to comply; the continued failure to render full compliance even after the district court in its May 21,

1985 hearing held out the possibility of forgiveness if full compliance were forthcoming; the subsequent failure of appellants to seek any alteration or termination of the daily fines prior to the government's final motion for partial summary judgment. We agree with the government that the court's action on February 26, 1986 was not the imposition of a punitive fine but the recognition and liquidation of the debt accumulated during the period of noncompliance. As the government cogently argues, to allow appellants to avoid the consequences of their civil contempt solely because, at the date of reckoning, compliance is impossible would only encourage stonewalling.

Additional arguments, not concerning the fixing of the fines, have been made. One was that the subpoena did not clearly and specifically target "index cards." It merely said "any and all records relating to fund raising." Another claim was that the Wilkes affidavit named only Caucus as a party of ownership, and that the remaining allegations were hearsay or fell below an acceptable standard of proof. As to the sufficient specificity of "any and all records relating to fund raising" to include index cards, here again, not only before but after the subpoenas were held enforceable, the argument was never made in the court below that "any and all" did not include index cards. Any hesitation we might have is neutralized by the fact that as early as November, 1985 the government made clear to Caucus its contention that index cards were central to its request. In its motion to compel production, it cited the concession of a key Caucus employee, its record keeper, on October 29, 1985, that index cards were covered by the subpoena.

■ The remaining issues concern the validity and sufficiency of the Wilkes affidavit. We dispose first of arguments that the affidavit was defective because of hearsay and because it did not constitute clear and convincing proof. These arguments were not made in the district court and we therefore do not deal with them here. The major attack on the affidavit is that, in light of the fact that in the past only Cau-

cus was linked to the index cards, the affidavit's reference to "contemnors' offices" was too slender a reed on which to base sanctions against the other three organizations, at least without an evidentiary hearing.

These contentions diminish in substance as we consider the way in which the issues involving the affidavit developed. Prior to the filing of the affidavit, each contemnor had filed an opposition to the government's September 1, 1986 motion for partial judgment, each asserting it had fully complied with its obligations to produce documents and a record keeper. The issue of compliance narrowed, however, after the filing of the Wilkes affidavit. The assertions in the affidavit of the large numbers of cards found in "contemnors' offices" and of the custody of thousands of index cards by "the contemnor organizations," many of these cards predating the issuance of the subpoena, with the attached sample cards referencing NDPC and Fusion, changed the focus to the asserted failure of contemnors to produce index cards prior to their seizure.

The court, fully aware of the new focus, granted, as we have seen, twenty days to allow contemnors to respond. Two contemnors, Caucus and Campaigner, elected not to respond but to attempt to appeal the denial of a stay. Fusion and NDPC merely reiterated that they had produced massive documentation. Their only reference to index cards was that in the past no one had ever contended that they were connected with them. *There was no affidavit denying such connection,* nor any disavowal of references to them in the cards attached to the Wilkes affidavit. Under these circumstances we see no abuse of discretion or violation of due process in proceeding, after such an absence of invited factual response, to decision without an evidentiary hearing.

### Post-grand jury running of civil fines

■ Much more substantial, not in any way implicated in any prior holding or argument in this case, is the claim that a judicial order imposing a continuing per diem fine does not have a longer life than the grand jury for which the order was issued. In this case, the fines attributable to the period before the demise of the grand jury amounted to roughly $2,710,000 for Campaigner, Fusion, and NDPC—instead of $5,110,000.[1] The fine for Caucus, before the termination of the grand jury, was approximately $2,510,000. The added, post-grand jury fine was approximately $3,545,000.[2]

The government acknowledges that the survival of civil contempt sanctions beyond the life of a grand jury for which the sanctions were to compel production of evidence is one of first impression. But it argues that where an investigation is continued by a second grand jury, termination of the first grand jury is "a mere technicality." It points out that, unlike 28 U.S.C. § 1826(a)(2) which limits the incarceration of a witness for civil contempt to "the term of the grand jury, including extensions," there is no statute limiting the duration of coercive fines. Fines, it argues, do not implicate the concerns attending the loss of liberty through incarceration. It then notes that there is "nothing magical" about the first grand jury; it did not issue the subpoenas—the prosecutor filled out the forms provided by the clerk of the court and a marshal served them. Subpoenas may be served prior to the impanelling of a grand jury. *United States v. Stevens,* 510 F.2d 1101, 1106 (5th Cir.1975). And a subpoena issued by one grand jury may be used to obtain evidence for a second grand jury. *In re Grand Jury Proceedings (Sutton),* 658 F.2d 782, 783 (10th Cir.1981). Fi-

---

1. We take an approximate figure of 240 days between January 1 and September 1, 1986, multiply it by $10,000 a day, and arrive at $2,400,000, which, when subtracted from $5,110,000, yields $2,710,000.

2. Noncompliance from April 25, 1985 through December 31, 1985, or 251 days, at $10,000 a day equals $2,510,000. Noncompliance from January 1 through January 23, 1986 at $10,000 a day equals $230,000. Noncompliance from January 24 through September 1, 1986 or 221 days at $15,000 a day equals $3,315,000. The total is $6,055,000. $6,055,000 minus $2,510,000 equals $3,545,000.

nally, the government argues, a witness may comply with a subpoena even after the termination of a grand jury by turning over requested records to the prosecutor. The accumulation of daily fines would cease with the return of an indictment, the running of the relevant statute of limitations, or the termination of the investigation.

With due regard to these arguments, we resist the invitation to adopt a rule that would extend the running of civil contempt fines beyond the life of the original grand jury. We see little inconvenience to the government, if a first grand jury is unable to complete its investigation, in seeking a new adjudication of civil contempt during the term of a successor grand jury. And we see grave problems lurking in allowing the civil fine meter to continue running until somehow it is determined that an investigation has ceased.

First, while the statutory scheme does not speak directly to the present problem, its basic thrust seems to contemplate that a grand jury's work—and therefore the district court's coercive power to enable the grand jury to do its work—ends with the life of the grand jury. Prior to the 1983 amendment of Fed.R.Crim.P. 6(g), a grand jury could serve no longer than eighteen months. That amendment allowed a court to extend the life of a grand jury for up to six months if the public interest so warranted. As the Notes of the Advisory Committee on Rules elaborate:

> This permits some flexibility, but reflects the fact that extension of regular grand juries beyond 18 months is to be the *exception* and not the norm. The intention of the amendment is to make it possible for a grand jury to have sufficient extra time to wind up an investigation when, for example, such extension becomes necessary because of the unusual nature of the case or unforeseen developments.

Fed.R.Crim.P. 6(g) advisory committee's note to 1983 amendment (emphasis added).

The intention to give a grand jury "extra time to wind up an investigation" rubs against a judicially created extension of a grand jury's sanction power beyond the "extra time" given by the rule. We are reinforced in this belief by the quite different provisions of the Organized Crime Control Act of 1970, Title I, 18 U.S.C. §§ 3331–3334. Section 3331, for example, allows a court to extend the life of a special grand jury, if its business has not been completed, up to a total term of thirty-six months. And, under § 3333(e), in investigations of misconduct involving appointed public officials and of organized crime conditions, a special grand jury's term may be extended beyond thirty-six months for the taking of needed additional testimony. Here, too, we are reluctant to add to a grand jury's powers where Congress has shown that it knows how to act.

Such case law as there is suggests a termination of coercive power with the final discharge of a grand jury. In a case preceding the current statute, *Shillitani v. United States,* 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966), the Court was dealing with a civilly contumacious witness whose incarceration continued after the grand jury was discharged. It observed that the justification of coercive imprisonment depended "upon the ability of the contemnor to comply with the court's order." *Id.* at 371, 86 S.Ct. at 1536. Such a justification disappears when a witness "has no further opportunity to purge himself of contempt." *Id.*[3] The government, as we have noted, argues that in the instant case the contemnors do have an opportunity to purge themselves by delivering the records to the prosecutor.

We are troubled by the suggestion to construe *Shillitani* so narrowly. In the first place, the Court's opinion ended with the broad statement, "Once the grand jury

---

**3.** A number of cases hold that a civil contemnor may not remain incarcerated beyond the life of the grand jury: *United States v. Petito,* 519 F.Supp. 838, 842 (E.D.N.Y.1981), *aff'd,* 671 F.2d 68 (2d Cir.1982); *In re Grand Jury Investigation (Braun),* 600 F.2d 420, 425 (3d Cir.1979); *In re Grand Jury Proceedings (Shocker),* 541 F.2d 464, 465 (5th Cir.1976); *cf. Yates v. United States,* 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957); *see also Loubriel v. United States,* 9 F.2d 807 (2d Cir.1926).

ceases to function, the rationale for civil contempt vanishes, and the contemnor has to be released." *Id.* at 372. In the second place, the Court's reference to "the doctrine that a court must exercise '[t]he least possible power adequate to the end proposed'" seems as applicable to coercive fines as to imprisonment, as does its recognition that sanctions may be "continued or reimposed" if a witness adheres to his refusal to comply before a successor grand jury. *Id.* at 371 n. 8 (citation omitted).

The Court of Appeals for the Second Circuit in *United States v. First National City Bank*, 396 F.2d 897 (2d Cir.1968), is the only court we are aware of to pronounce explicitly on the inability of civil fines to survive the demise of the issuing grand jury. In commenting on a $2,000 per day civil fine against a bank and the civil imprisonment of an individual, it said with regard to both, "the punishment could not extend beyond the expiration of the life of the Grand Jury." *Id.* at 900 n. 9. The government discounts this as dictum. Whether that is so or not, the statement is a deliberate one, its seriousness underscored by the action of the court (upholding the sanctions) in directing that mandate issue forthwith "[s]ince the life of the Grand Jury is rapidly drawing to a close." *Id.* at 905. More recently, the same court has indicated: "The policy underlying civil contempt under [18 U.S.C. § 1826] is the same whether confinement is ordered or fines are imposed." *In re Grand Jury Witness*, 835 F.2d 437, 442 (2d Cir.1987).

Perhaps our most significant difficulty lies in contemplating how, when witnesses have been subpoenaed, as here, both "to appear ... to testify" and to bring documents to a specific grand jury and that jury has been discharged, a court would handle attempts to purge. If, as the Court of Appeals for the Seventh Circuit has observed, "[R]ecipients of the subpoenas could choose to exercise their right to appeal before the grand jury themselves, rather than decide merely to relinquish the records to the [law enforcement officials]," *United States v. McComb*, 744 F.2d 555 (7th Cir.1984), that choice is no longer available. Apart from this, a court would be placed in the anomalous position of determining whether the response of a witness in supplying or failing to supply documents facilitated or frustrated the work of a grand jury that no longer existed. If we were to envisage the court determining whether the investigation were still "ongoing," such as to merit the daily accumulation of very substantial fines, we would have to face a host of problems. Such problems would include: how much and what evidence of continued activity is necessary, how immediate would the convening of another grand jury have to be, a standard for judicial review, a guarantee against prosecutorial vindictiveness or arbitrariness, a means of preventing contemnors from being unfairly lulled by prosecutorial inaction, etc. Particularly since it would be relatively simple—and clear cut—for a successor grand jury to reimpose coercive sanctions, we prefer not to enter this thicket.

The government's fear that witnesses will be led to "wait out" a grand jury's life does not seem substantial. While "waiting out," their daily fines accumulate. Moreover, there is nothing to prevent the prosecution, aware of the forthcoming expiration of a grand jury, from coming into court seeking liquidated partial judgment. Then too, new and perhaps more burdensome sanctions may be imposed by a successor grand jury. And the court always has available the sanction of criminal contempt. As Judge Magruder said for our court, "But the required vacation of the remedial order ... does not trench upon the power of the court, in a proper case, to vindicate its own authority by punishment of an offender for a criminal contempt." *Parker v. United States*, 153 F.2d 66, 77 (1st Cir. 1946). *See also United States v. Professional Air Traffic Controllers*, 678 F.2d 1, 4 (1st Cir.1982).

\* \* \*

We, therefore, vacate the judgments and, since the exact date of expiration of the initial grand jury is not revealed by the record, remand these cases to the district

court for computation of the aggregate fines in accordance with our opinion.

No costs.