**In re SEALED CASE.**

No. 99–3125.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 25, 2000.

Decided July 14, 2000.

Before: WILLIAMS, GINSBURG and ROGERS, Circuit Judges.

Opinion for the Court filed by Circuit Judge WILLIAMS.

STEPHEN F. WILLIAMS, Circuit Judge:

A lawyer resisted compliance with a federal grand jury subpoena on grounds of privilege, and the government filed a motion to compel compliance. Finding the documents privileged, the district court reviewed them *in camera* and found them subject to the crime-fraud exception. Accordingly it ordered them produced. We reverse: the understanding of the federal elections laws supporting application of the crime-fraud exception is erroneous.

\* \* \*

Because this case is under seal we endeavor to provide no more information than is necessary to our disposition. Principles governing the relationships of courts and agencies, however, compel us to address—and, indeed, ultimately defer to—a civil enforcement recommendation issued by the Federal Elections Commission ("FEC") when the matter was before it. See *In re RNC, Alec Pointevint, and Haley Barbour*, Matter Under Review ("MUR") 4250. We thus divulge facts of the case to the extent they appear in the Statement of Reasons associated with the MUR, Statement of Reasons of Commissioners Wold, Elliott and Mason, MUR

4250 (Feb. 11, 2000), a document that 11 C.F.R. § 4.4(a)(3) requires be made public. Of course, the subject of this case might theoretically be different from that of the Commission proceeding, but the factual similarity is so obvious that it would be pointless to suppress the actual names.

In May 1993 three officials of the Republican National Committee ("RNC"), including the Chairman Haley Barbour, founded the National Policy Forum ("NPF"), a separately incorporated, not-for-profit think tank. Through September 1994 NPF received loans totaling $2,345,000 from the Republican National State Elections Committee ("RNSEC"). RNSEC is a "nonfederal" account of RNC and thus is not a "political committee" for purposes of certain disclosure requirements and contribution rules of the Federal Election Campaign Act of 1971 ("FECA"), 2 U.S.C. § 431 *et seq.* See, e.g., *id.* § 433 (registration requirements of political committees), § 434(a)-(b) (reporting requirements of political committees), § 441a(1)-(2) (limitations on contributions to and by political committees).

In September 1994, when NPF still owed RNSEC $2,145,000, Barbour and other NPF and RNC officials arrived at an agreement with Ambrous Young, a foreign national. Young's corporation, Young Brothers Development, Ltd.–Hong Kong ("YBD–Hong Kong"), would provide $2,100,000 in collateral through its U.S. subsidiary to secure a loan of that amount from Signet Bank to NPF. On October 17, 1994 Signet disbursed the loan to NPF, and on October 20 NPF used $1,600,000 of the proceeds to repay a portion of the original loan from RNSEC.

The FEC's General Counsel recommended that the Commission find probable cause to believe that RNC and its officials had violated 2 U.S.C. § 441e(a)—a prohibition on receipt of contributions from foreign nationals. The Commission split 3–3, and because a majority of commissioners is required to find probable cause, 2 U.S.C. § 437g(a)(4)(A)(i), the vote precluded Com-

mission enforcement action. *In re RNC, Alec Pointevint, and Haley Barbour,* MUR 4250. The three commissioners who voted for no-action provided a Statement of Reasons, details of which will follow.

NPF's loan repayment also drew the attention of the Department of Justice, which here rests its crime-fraud exception claim on the theory that the repayment transaction amounted to solicitation and receipt of foreign contributions by the RNC in violation of § 441e(a), and conspiracy by various RNC officials to defraud the United States for failing to disclose the transaction, 18 U.S.C. §§ 371, 1001.

On September 8, 1997 a grand jury subpoenaed the lawyer who had served as general counsel of RNC in the period surrounding the loan repayment. He declined to produce a number of documents that he claimed were subject to the attorney-client and work-product privileges. The government filed a motion to compel compliance, and the RNC intervened to oppose the motion. Finding that the privileges did not attach, the district court ordered the general counsel to produce some of the withheld documents; on appeal by the RNC, this court reversed. *In re Sealed Case,* 146 F.3d 881, 888 (D.C.Cir. 1998). On remand the district court ordered the documents produced, holding that those privileges, though applicable in the first instance, were subject on the facts here to the crime-fraud exception. Not discussing the alleged "crimes" in detail, the district court said simply that "the evidence shows that the RNC sought the advice of [the general counsel] in an effort to construct the loan guarantee transaction in a manner designed to conceal from the FEC the source of the funds used to acquire the loan," and "to evade federal election campaign laws." Concluding that the government has failed to allege any conduct that is criminal under FECA, we reverse.

\* \* \*

■ Appellant RNC first argues that the case is moot. The theory is that this court lacks, and the district court before it lacked, authority to enforce the subpoena because the grand jury that issued the subpoena had expired before the district court issued its order on September 24, 1999 granting the motion to compel compliance. The RNC relies primarily on the First Circuit's opinion in *In re Grand Jury Proceedings (Caucus Distributors, Inc.)*, 871 F.2d 156, 161 (1st Cir.1989), in which the court held that the running of civil contempt fines must stop at the expiration of the grand jury under whose aegis the contempt citation was issued, even though a second grand jury pursuing the same matter had been convened.

But whereas in *Caucus Distributors* the shift in grand juries occurred during the contempt enforcement process, here it occurred before that even started. The analogic force that the *Caucus Distributors* court drew from the statutory rule that recalcitrant witnesses may not be confined beyond "the term of the grand jury, including extensions, before which such refusal to comply with the court order occurred," 28 U.S.C. § 1826(a)(2); 871 F.2d at 160–61, is plainly absent. Indeed, the First Circuit was explicit that a "subpoena issued by one grand jury may be used to obtain evidence for a second grand jury." *Id.* at 160. While the court saw the continuous running of fines after expiration of the contempt grand jury as posing difficult questions as to when "an investigation has ceased," *id.* at 161, such questions, if pertinent at all in this context, impose no comparable risk of ever-accumulating penalties for an offense that may have become moot. Finally, the court relied heavily on language in *Shillitani v. United States*, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); although there the initial grand jury investigation had evidently ceased altogether, with no successor grand jury, the Court had written broadly, seeming to require termination of contempt remedies after *any* such expiration, regardless of successorship. See *id.* at 372, 86 S.Ct. 1531, cited at 871 F.2d at 161–62.

Appellant has identified no prejudice arising from enforcement of a subpoena where the originally issuing grand jury has expired and another has indisputably carried the investigation forward. A parallel situation was presented in *United States v. Kleen Laundry & Cleaners, Inc.*, 381 F.Supp. 519, 521 (E.D.N.Y.1974), where the district court upheld enforcement of a subpoena issued by a federal prosecutor in the name of a grand jury that was not sitting at the time but would be sitting on the return date. The court saw no prejudice to the witness and noted that it is "the prosecutor who has the initiative and power by subpoena to bring proof to the courthouse." See *id.* at 522; see also *In re Immunity Order Dated April 21, 1982*, 543 F.Supp. 1075, 1078 (S.D.N.Y.1982). Thus we reject the claims of a lack of power in the district court to enforce the subpoena.

\* \* \*

■ On the merits, there are slightly different—and here immaterial—differences in the formulation of the test for the crime-fraud exception as applied to the two privileges in question, attorney-client and work-product. To establish the exception to the attorney-client privilege, the court must consider whether the client "made or received the otherwise privileged communication with the intent to further an unlawful or fraudulent act," and establish that the client actually "carried out the crime or fraud." *In re Sealed Case*, 107 F.3d 46, 49 (D.C.Cir.1997). To establish the exception to the work-product privilege, courts ask a slightly different question, focusing on the client's general purpose in consulting the lawyer rather than on his intent regarding the particular communication: "Did the client consult the lawyer or use the material for the purpose of committing a crime or fraud?" *Id.* at 51. Here the application of the crime-fraud exception turns on a pure question of

law, which we resolve de novo. *United States v. Kim,* 23 F.3d 513, 517 (D.C.Cir. 1994).

■ This case does not fall within the crime-fraud exception because what RNC and its officials are accused of is not criminal. The government alleges that RNC "conspire[d] either to commit an[ ] offense against the United States or to defraud the United States" in violation of 18 U.S.C. § 371. Contrary to the government's assertion that impossibility as a matter of law is not a defense to conspiracy, it clearly is in this context. Because the transaction described by the government does not violate FECA, there can be no finding of conspiracy. "Pure legal impossibility is always a defense. For example, a hunter cannot be convicted of attempting to shoot a deer if the law does not prohibit shooting deer in the first place." *United States v. Hsu,* 155 F.3d 189, 199 n. 16 (3rd Cir. 1998). Obviously a charge of conspiracy to shoot a deer would be equally untenable.

As we understand the government's position, the RNC's guilt turns on two alternative theories, both of which assume that the prohibition of 2 U.S.C. § 441e(a) on contributions by foreign nationals applies not only to contributions to a "federal account" such as RNC's but also to contributions to a nonfederal account, here RNSEC. Besides that each theory has what may be viewed as a substantive element (characterizing a specific element of the transaction as the illicit "contribution") and an element collapsing legally distinct entities. In the first theory, (1) NPF's repayment of the loan to RNSEC is classified as a "contribution"; and (2) YBD–Hong Kong is seen as the contributor, by an elision of the entities. In the second, (1) YBD–Hong Kong's provision of the loan guarantee to NPF is the relevant "contribution"; and (2) RNSEC is viewed as the recipient. In light of the Commission's statutory interpretation, both theories flunk; the collapsing of entities is unjustified, and the substantive element of the first theory (treating a loan repayment as a "contribution") is false.

Because the Commission has in effect spoken to both theories, we start by considering whether we should defer to Commission interpretations in the context presented here—where the Department of Justice in a criminal case relies on an interpretation of the relevant statutes that has been rejected by the Commission in a 3–3 decision that, under the statutory voting mechanism, 2 U.S.C. § 437g(a)(4)(A)(i) (requiring affirmative vote of four commissioners), controls Commission enforcement.

We have already held that we owe deference to a legal interpretation supporting a negative probable cause determination that prevails on a 3–3 deadlock. See *FEC v. National Republican Senatorial Committee,* 966 F.2d 1471, 1476 (D.C.Cir.1992). There the issue involved interpretation of an FEC regulation rather than of FECA (a distinction we return to later), and we relied on an earlier decision of this court insisting that, to enable judicial review, a no-action decision by three commissioners must be backed by their statement of reasons. *Id.* (citing *Democratic Congressional Campaign Committee v. FEC,* 831 F.2d 1131, 1134–35 (D.C.Cir.1987)).

■ It is irrelevant that the prevailing interpretation was established in the context of agency enforcement, whereas this is a criminal prosecution. Deference is due as much in a criminal context as in any other for interpretations made outside that context, such as those found in published regulations. See *United States v. Kanchanalak,* 192 F.3d 1037, 1047 n. 17 (D.C.Cir. 1999) ("That criminal liability is at issue does not alter the fact that reasonable interpretations of the act are entitled to deference."); see also *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon,* 515 U.S. 687, 703–05, 115 S.Ct. 2407, 132 L.Ed.2d 597 (1995).

Here, unlike in *National Republican Senatorial Committee,* agency interpreta-

tion of a statute rather than a regulation is at issue. The Supreme Court has recently elaborated its view of the conditions for deference, both as to regulations, see *Auer v. Robbins,* 519 U.S. 452, 117 S.Ct. 905, 137 L.Ed.2d 79 (1997), and statutes, see *Christensen v. Harris County,* —— U.S. ——, 120 S.Ct. 1655, 146 L.Ed.2d 621 (2000). As to statutes, the focus of our interest here, the Court drew the line between interpretations that are controlling on us if "reasonable," under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 844, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), or merely "entitled to respect" to the extent that they have "power to persuade," under *Skidmore v. Swift & Co.,* 323 U.S. 134, 139, 65 S.Ct. 161, 89 L.Ed. 124 (1944). The Court appeared to make the interpretation's legal effect the touchstone: "Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which *lack the force of law*—do not warrant *Chevron*-style deference." *Christensen,* —— U.S. at ——, 120 S.Ct. at 1657 (emphasis added). (As examples of agency documents that merit *Chevron* deference the Court listed formal adjudications and notice-and-comment rulemakings. See *id.*) In support, the Court cited *Martin v. OSHRC,* 499 U.S. 144, 111 S.Ct. 1171, 113 L.Ed.2d 117 (1991), where it had made *Chevron*-style deference turn on whether the interpretation "derive[d] from the exercise of the [agency's] delegated lawmaking powers." *Id.* at 157, 111 S.Ct. 1171. Although *Martin* involved a regulatory interpretation, its use by the *Christensen* Court supports its application to statutory interpretation as well. Regardless of possible differences of nuance between these views, we find the Commission's probable cause determination here entitled to deference under both.

Under §§ 437g(a)(4)(A)(i), (5)(C), and (6)(A) the probable cause determination is part of a detailed statutory framework for civil enforcement and is analogous to a formal adjudication, which itself falls on the *Chevron* side of the line. Like the citation to which the Court deferred in *Martin,* the probable cause determination "assumes a form expressly provided for by Congress." *Martin,* 499 U.S. at 157, 111 S.Ct. 1171. The General Counsel advocates and the respondent opposes a finding of probable cause; through this statutorily mandated adversarial process, see 2 U.S.C. § 437g(a)(1), (3), the agency "gives ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *INS v. Aguirre–Aguirre,* 526 U.S. 415, 425, 119 S.Ct. 1439, 143 L.Ed.2d 590 (1999) (citation and internal quotation marks omitted). Unlike a judicially unreviewable SEC no-action letter, which this court has said would not merit *Chevron* deference, *Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 427 n. 19 (D.C.Cir.1992) ("[T]he principle of deference described in [*Chevron*] is not applicable here, for neither the staff's no-action letter nor the Commission's brief ranks as an agency adjudication or rulemaking."), the no-action decision here was made by the Commission itself, not the staff, and precludes further enforcement. Compare *Board of Trade of Chicago v. SEC,* 883 F.2d 525, 529 (7th Cir.1989) ("[The SEC staff] could change [its] mind tomorrow, or the Commissioners might elect to proceed no matter what the [staff] recommends. The SEC has not, in other words, issued a 'final' decision...."). Congress vested enforcement power in the FEC, carefully establishing rules that tend to preclude coercive Commission action in a partisan situation, where the Commission, itself statutorily balanced between the major parties, 2 U.S.C. § 437c(a)(1) ("No more than 3 members of the Commission appointed under this paragraph may be affiliated with the same political party."), is evenly split. If courts do not accord *Chevron* deference to a prevailing decision that specific conduct is not a violation, parties may be subject to criminal penalties where Congress could not have intended that result.

This reasoning is consistent with *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. 27, 37, 102 S.Ct. 38, 70 L.Ed.2d 23 (1981), where the Court, in deciding whether the Commission's decision to dismiss a complaint was "contrary to law," 2 U.S.C. § 437g(a)(8)(C), deferred to the Commission's interpretation. Although the Court cited *Skidmore* (*Chevron* after all had not yet been decided), it spoke in terms more consonant with *Chevron*. The interpretation need only be "sufficiently reasonable," *FEC v. Democratic Senatorial Campaign Comm.*, 454 U.S. at 39, 102 S.Ct. 38 (citation omitted), and "[t]o satisfy this standard it is not necessary for a court to find that the agency's construction was the only reasonable one or even the reading the court would have reached if the question initially had arisen in a judicial proceeding." *Id.* Similarly, as this court has said (again not explicitly in *Chevron* terms), a 3–3 deadlock would be subject to great deference: "In the absence of prior Commission precedent ..., judicial deference to the agency's initial decision or indecision would be at its zenith." *Democratic Congressional Campaign Committee v. FEC*, 831 F.2d 1131, 1135 n. 5 (D.C.Cir.1987).

■ We now turn to the Commission's (i.e., the prevailing) interpretation of the applicable statutes in the Statement of Reasons for MUR 4250. The Department's first theory here strikes out on the failure of its basic claim that a loan repayment is a contribution. On its face this is improbable. It would be unusual to characterize a loan repayment—which could include, for example, simple payment on a purchase money mortgage on a property sold by a political committee—as a "contribution." The Commission here rejected the idea that the final loan repayment from NPF to RNSEC fell within the definition of "contribution." The statute defines "contribution" as "any gift, subscription, loan, advance, or deposit of money or anything of value made by any person for the purpose of influencing any election for

Federal office." 2 U.S.C. § 431(8)(A)(i). No reason appears why repayment of a lawful debt could qualify. It is true that strictly speaking the definition applies only to hard money contributions ("any election for *Federal office*"), and thus not directly to a contribution to RNSEC, which because of its non-federal character is not a "political committee." But in the absence of a separate definition for soft money contributions, we have no reason to think that Congress would intend a broader definition of "contribution" in the soft money context than in the hard money context. Cf. *Kanchanalak*, 192 F.3d at 1046–47 & n. 19.

In rejecting the inclusion of a loan repayment in the idea of "contributions," the Commission observed that its regulation did not purport to expand the statutory definition. MUR 4250 at 3 & n.3. Indeed, the regulation's formal definition contains no reference to "loan repayments," and goes on to say that "[r]epayment of the principal amount of [a loan by a political committee] to such political committee shall not be a contribution by the debtor to the lender committee." 11 C.F.R. § 100.7(a)(1)(i)(E).

The FEC's General Counsel before the Commission sought, and the government here seeks, to turn this regulation into a sword. It points to the clause of 11 C.F.R. § 100.7(a)(1)(i)(E) saying that repayment to a political committee of the principal of a loan "shall be made with funds which are subject to the prohibitions of" various regulations, including a regulatory equivalent of the ban on foreign contributions. But as the Commission responded, the regulation is specifically limited to repayments to political committees, and thus is not applicable here. MUR 4250 at 5. The government says the Commission and appellant cannot rely on § 100.7(a)(1)(i)(E) selectively, that they must take the bitter with the sweet. But citation of a regulation purporting only to govern loans by political committees as support for the obvious reading of the statutory term does not

seem to us logically to require accepting its caveat on source of funds, where the caveat has no visible statutory support and the regulation does not even purport to cover non-political committees.

We thus turn to the government's theory that RNC officials violated 2 U.S.C. § 441e(a)'s ban on foreign contributions by bringing about, or helping to bring about, YBD–Hong Kong's guarantee of the loan to NPF. That a loan guarantee is a contribution is an easy step. It is clearly a valuable economic contribution, and the Commission's regulations (again for political committees), having defined contribution to include a loan, go on to define loan to include a "guarantee." 11 C.F.R. § 100.7(a)(1)(i). And the government's contention that 2 U.S.C. § 441e(a) covers contributions for non-federal elections (e.g., to RNSEC) is here supported by the Commission, MUR 4250 at 6, and meets the test of reasonableness. The ban speaks to contributions in connection with an election "for any political office," 2 U.S.C. § 441e(a); although as we have seen, the statutory definition of contribution addresses only elections "for Federal office," 2 U.S.C. § 431(8)(A)(i), we have already upheld the FEC's resolution of that contradiction in favor of a broad reading of the ban. *Kanchanalak*, 192 F.3d at 1046–50.

But unless NPF can somehow be telescoped together with either RNSEC or RNC, YBD–Hong Kong's contribution to NPF is no violation. One possible device would be a notion that NPF was really part of RNC, but the government has not seriously voiced such a claim. Although its brief contains occasional language such as the assertion that "NPF was operated as a *de facto* division or subsidiary of the RNC," nowhere does it coherently argue that NPF is not legally distinct from RNC, that the rules applicable to political committees apply to NPF, or that the relevant "contribution" was the loan guarantee directly from YBD–Hong Kong to NPF. Instead it considers NPF an intermediary:

"[YBD–Hong Kong's] domestic subsidiary's] apparently innocuous guarantee of a $2.1 million bank loan to the NPF suspiciously begins to resemble a prohibited foreign campaign contribution that was simply passed through the NPF."

Thus the heart of the government's case is the argument that the transactions should be considered end-to-end, beginning with the loan guarantee made by YBD–Hong Kong and ending with the repayment from NPF to RNSEC. Here the Commission is flatly to the contrary, and its view that there is no basis for treating the several legally distinct transactions as one is reasonable. The Commission considered each of the various elements—the "loan from the RNSEC to NPF, the collateral from [YBD–Hong Kong] to Signet, the loan from Signet to NPF, and the repayment from NPF to the RNSEC," MUR 4250 at 10—and found none of them to be without valid business purpose. *Id.* at 10–11. The government has weakly claimed that the initial loan was sham, the creation of a debt for which the RNC never expected full repayment. The Commission found the charge rebutted "by the documentation of the loans with a promissory note and RNC's reporting of the loans; by the fact that NPF did repay $200,000 of the loans prior to receiving the loan from Signet Bank; and by the efforts of the RNC's officers to find sources of funds for NPF that would enable NPF to repay the loans." MUR 4250, at 9. The government points to nothing contradictory.

Second, the government relies heavily on the idea that RNC's purpose in bringing about the YBD–Hong Kong guarantee, and perhaps Young's in giving it, was to enable NPF to repay its loan to RNSEC. But the Commission rejected the principle that the parties' purposes can tie together a set of lawful transactions, each with a legitimate business purpose, to create an unlawful one. MUR 4250 at 9–14.

In so doing, the Commission relied on precedent. In *In re Fisher*, MUR 4000

(1994), a candidate for Senate invited potential contributors to donate $1000 to the current campaign, and an additional $1000 to each of three previous campaigns (assuming they had not already contributed to them), to help those committees retire their debts. The candidate promised that he would match, with contributions to the current campaign, any funds contributed for retirement of the old debts. Because the only debts of the prior campaigns were to the candidate himself, the overall effect was to generate funds—in excess of the $1000 per-individual limit—for the current campaign. The Commission nonetheless found unanimously that these contributions would not be deemed to have exceeded the $1000 maximum. Here the FEC General Counsel sought to distinguish *Fisher* on the theory that the donors did not know that their donations would eventually reach Fisher's current campaign. The claim is highly improbable, as the campaign solicitations set a target for each "couple" of "$5000 for Richard's campaign." MUR 4000 at 3. In any event, the Commission then did not consider the contributors' knowledge to be relevant. This seems reasonable: where the recipient is fully informed, there appears no reason why varying degrees of knowledge on the part of donors should be pivotal in determining the recipient's guilt.

The government's theory of a reporting violation is even weaker. 11 C.F.R. § 104.8(e) requires that "National party committees [e.g., RNC] shall disclose ... information about each ... entity that donates an aggregate amount in excess of $200 in a calendar year to the committee's non-federal account(s) [e.g., RNSEC]. This information shall include the donating individual's or entity's name...." We need not consider whether a loan guarantee such as that made by YBD–Hong Kong falls within the donations covered by § 104.8, or whether a guarantor such as YBD–Hong Kong is properly considered a "donating individual." Our rejection of the government's effort to treat the two transactions as one moots both issues. To the extent that YBD–Hong Kong "donated" a loan guarantee it did so to NPF and not to the RNSEC, and thus the RNC was not required to report the identity of the guarantor.

The government has noted that in making its case to the district court for the crime-fraud exception it has included evidence not before the Commission in MUR 4250. (The appellant notes, in parallel, that it has never *seen* the evidence before the district court.) But this does not alter or even bear on the gaps in the legal theories marshaled by the government to support the exception. There may somewhere be evidence such that, under valid legal theories, the government can justify applying the exception. But until the government tries to assemble its evidence around valid theories, the character of the evidence is largely irrelevant.

\* \* \*

Because we find that the legal theories invoked to support application of the crime-fraud exception are without exception faulty, we reverse.

*So ordered.*