UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2006

(Argued: September 15, 2006      Decided: November 3, 2006
                                 Errata Filed: November 21, 2006)

Docket No. 05-5634-ag

————————

G&T TERMINAL PACKAGING CO., INC. & TRAY-WRAP, INC.,

*Petitioners,*

—v.—

UNITED STATES DEPARTMENT OF AGRICULTURE,

*Respondent.*

————————

B e f o r e : MESKILL, SOTOMAYOR, and KATZMANN, *Circuit Judges*.

————————

Petition for review from a decision of the Secretary of Agriculture revoking petitioners' licences to operate in the wholesale produce trade pursuant to the Perishable Agricultural Commodities Act ("PACA"). The Secretary found that petitioners failed "to perform [a] specification or duty, express or implied, arising out of any undertaking in connection" with any "transaction involving any perishable agricultural commodity," 7 U.S.C. § 499b(4), by making illicit cash payments to USDA inspectors. The Secretary further found that the pattern of corruption practiced by the USDA inspectors was not sufficiently coercive to provide "reasonable cause" for the petitioners' breaches of this duty. We accord *Chevron* deference to the Secretary's construction of the scope of the implied duties created by the PACA and find that construction to be reasonable. We do not decide whether the Secretary's unexplained conclusion that the inspectors' corruption did not supply "reasonable cause" for the petitioners' breaches is similarly entitled to deference under *Chevron* because we would reach the same result were we to review the agency's decision *de novo*. **AFFIRMED.**

————————

APPEARING FOR PETITIONERS: LINDA STRUMPF (Sarah R. Smetana, *on the brief*), New Canaan, CT

APPEARING FOR RESPONDENT: STEPHEN M. REILLY, Senior Counsel, Office of the General Counsel (JAMES MICHAEL KELLY, Acting General Counsel and MARGARET M. BREINHOLT, Assistant General Counsel, *on the brief*), U.S. Department of Agriculture, Washington, D.C.

_____

KATZMANN, *Circuit Judge*:

The matter at hand calls upon us to interpret the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499b, *et seq.*, specifically, to determine whether a PACA licensee bears an implied duty to refrain from paying illegal gratuities to a United States Department of Agriculture ("USDA") inspector, and the scope of the circumstances that constitute "reasonable cause" for the breach of such a duty.

This case arises out of the rampant corruption that existed for years, if not decades, in the Hunts Point Terminal Produce Market in the Bronx, NY. It is undisputed that many of the produce inspectors hired by the Department of Agriculture to provide impartial assessments of the condition of agricultural commodities arriving at Hunts Point for distribution throughout the metropolitan New York City area, far from acting as honest brokers, regularly accepted, and often demanded, cash payments from the merchants they were supposed to serve. When they did not receive payments from a merchant, the unscrupulous inspectors often would delay the performance of their duties or intentionally skew the results of their inspections in a manner calculated to harm the bottom line of the non-compliant merchant. In contrast, these inspectors gave preferential treatment to the merchants who crossed their palms with silver, quickly

2

responding to their requests for inspections and, at least in some cases, shading the outcomes of their inspections in favor of merchants who agreed to pay. This situation left merchants operating in the Hunts Point Market to decide whether to acquiesce in the corruption and pay the illicit gratuities, knowing that if they did not, they risked operating at a competitive disadvantage vis-à-vis the complicit merchants. Petitioners G&T Terminal Packaging Co, Inc. and Tray-Wrap, Inc., by their agent, Anthony Spinale, chose to pay. The question now before us is whether we may affirm the Secretary of Agriculture's conclusions (1) that the petitioners breached a duty impliedly imposed by the Perishable Agricultural Commodities Act in making these illegal payments, and (2) that the situational coercion created by the inspectors' corruption did not constitute "reasonable cause" for this breach. We grant *Chevron* deference to the Secretary's construction of the scope of the implied duties created by the PACA and affirm that construction as reasonable. We do not decide whether the Secretary's unelaborated determination that the "extortion evidenced in this proceeding is not a 'reasonable cause'" for Spinale's payments" is similarly entitled to deference under *Chevron* because we would reach the same conclusion upon a *de novo* review. We therefore deny the petition for review and affirm the Secretary's decision.

## I.

### A.

The Perishable Agricultural Commodities Act establishes a wide-ranging regulatory regime governing the wholesale trade in perishable goods such as fresh fruits and vegetables.[1]

---

[1] 7 U.S.C. § 499a(b)(4) provides that the term "perishable agricultural commodity . . . [m]eans any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and . . . [i]ncludes cherries in brine as defined by the Secretary in accordance with trade usages."

3

As Congress explained in enacting an amendment to PACA in 1956:

> The Perishable Agricultural Commodities Act is admittedly and intentionally a 'tough' law. It was enacted in 1930 for the purpose of providing a measure of control and regulation over a branch of industry which is engaged almost exclusively in interstate commerce, which is highly competitive, and in which the opportunities for sharp practices, irresponsible business conduct, and unfair methods are numerous. The law was designed primarily for the protection of the producers of perishable agricultural products--most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing-- and for the protection of consumers who frequently have no more than the oral representation of the dealer that the product they buy is of the grade and quality they are paying for.

> The law has fostered an admirable degree of dependability and fairness in this industry chiefly through the method of requiring the registration of all those who carry on an interstate business in perishable agricultural commodities and denying this registration to those whose business tactics disqualify them.

S. Rep. No. 84-2507, at 3 (1956), *as reprinted in* 1956 U.S.C.C.A.N. 3699, 3701.

The Secretary of Agriculture is charged with implementing and enforcing this regulatory regime, which permits only persons and entities that hold a valid license from the Secretary to participate in this trade. 7 U.S.C. § 499c(a).[2] By statute, the Secretary is empowered to award

---

[2] This subsection provides that "no person shall at any time carry on the business of a commission merchant, dealer, or broker without a license valid and effective at such time." 7 U.S.C. § 499c; *see also* 7 U.S.C. § 499d(a) (providing that the issuance of a license "entitle[s] the licensee to do business as a commission merchant and/or dealer and/or broker unless and until it is suspended or revoked by the Secretary."). 7 U.S.C. § 499a(b)(5) defines the term "commission merchant" to mean "any person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another." The term "dealer" is defined to mean, with certain exceptions, "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce." 7 U.S.C. § 499a(b)(6). "Broker" is similarly defined under the PACA, again with limited exceptions, as

damages to persons injured by PACA violations. *See* § 499e.[3] In addition, the Secretary possesses authority to revoke a previously granted license if, after the filing of a complaint and subsequent administrative proceedings, *see generally* § 499f, the license holder is found to have committed "flagrant or repeated" violations of § 499b. *See* § 499h(a). This sanction is strong medicine, as it has the effect of exiling the violator from the portions of the produce trade governed by the PACA. However, it is also integral to Congress' goal of restricting participation in this critical interstate trade to honest businesspersons.

**B.**

Petitioners G&T Terminal Packaging Co., Inc. ("G&T") and Tray-Wrap, Inc. ("Tray-Wrap") are New York corporations that have held PACA licenses since 1964 and 1970, respectively. G&T deals in wholesale potatoes, while Tray-Wrap operates in the wholesale tomato trade. The two companies share a common mailing address, a common pool of employees, and operated out of the same office at the Hunts Point Terminal Market in the Bronx,

---

"any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser, respectively." 7 U.S.C. § 499a(b)(7).

[3] Under the terms of this section, "[i]f any commission merchant, dealer, or broker violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages . . . sustained in consequence of such violation." 7 U.S.C. § 499e(a). The section further provides that "[s]uch liability may be enforced either (1) by complaint to the Secretary as hereinafter provided, or (2) by suit in any court of competent jurisdiction; but this section shall not in any way abridge or alter the remedies now existing at common law or by statute, and the provisions of this chapter are in addition to such remedies." 7 U.S.C. § 499e(b).

5

NY.[4]  In addition, they share close ties to Anthony Spinale, who was the director, president and 100 percent owner of G&T, and Tray-Wrap's founder and principal manager.

In late 1996, the USDA Office of the Inspector General and the FBI launched an investigation into allegations of corruption in the USDA office in Hunts Point, tipped off by "complaints from a variety of growers that wholesalers seemed to be taking advantage of the inspection system at Hunts Point, forcing growers to make constant price concessions."  The investigators discovered that "corrupt inspectors . . . were taking cash payments (usually $50 per container of produce) from produce wholesalers in exchange for agreeing to 'downgrade' produce on inspection certificates, to the substantial financial detriment of growers."  The investigation also "revealed the existence of an ongoing, coordinated criminal organization operating within the Hunts Point USDA office.  Supervisory inspectors used their positions to assign corrupt inspectors under them to conduct inspections that were likely to produce payoffs.  These inspectors in turn often kicked back a percentage of the cash payments to the supervisors in exchange for the favorable assignments."

William Cashin was one of the unscrupulous USDA inspectors.  After his arrest, Cashin cooperated with the ongoing investigation into the Hunts Point corruption by surreptitiously making audio and video recordings of his interactions with various Hunts Point inspectors and merchants.  Cashin's cooperation led to the arrest and indictment of seven other USDA inspectors.  The dragnet also ensnared several merchants who were making payments to the

_____

[4]The Hunts Point Terminal Market is the largest wholesale produce terminal in the United States, with annual revenues in excess of $1.5 billion annually.  *See* http://www.terminalmarkets.com/huntspoint.htm (last visited Sept. 26, 2006).

inspectors, including Spinale, who was indicted in the Southern District of New York on October 21, 1999, and charged with nine counts of bribing a public official in violation of 18 U.S.C. §§ 201(b)(1)(A) and (2).[5] On January 26, 2001, Spinale pleaded guilty to Count Nine of that indictment before Magistrate Judge Ronald Ellis. In the course of his allocution, Spinale admitted that "[o]n August 13, 1999, I paid money to Bill Cashin for the purpose of influencing the outcome of his inspection report on a load of potatoes. I told him the specific amount I wanted him to put in the inspection report. On the other dates in the Indictment, I paid Mr. Cashin $100 per inspection to influence the outcome of the report." Spinale immediately followed that statement by saying, "Your Honor, I would like to state I never intended to defraud the shippers who had sent me the produce." Spinale then reiterated that he was "paying [Cashin] to dictate what he was putting into the report." He also gave an affirmative response when the court asked, "[s]o it was [Cashin's] job to make reports about the produce that he was inspecting, and you were trying to influence him to write things in the report?" On August 21, 2001, District Judge Richard C. Casey accepted Spinale's plea and sentenced him, upon a downward departure, to a five-year term of probation, including twelve months of home confinement, and a $30,000 fine.

On June 3, 2003, the government filed an administrative complaint charging G&T and Tray-Wrap with having "willfully, fragrantly, and repeatedly violated Section 2(4) of the PACA

---

[5] The Hunts Point investigation and its conclusions are described in further detail in *Illegal Activities at the Hunts Point Market: Hearing Before the Subcomm. on Livestock and Horticulture of the H. Comm. on Agric.*, 106th Cong. 1-122 (2000), http://commdocs.house.gov/committees/ag/hag10658.000/hag10658_0.htm (last visited Oct. 9, 2006).

by failing, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with transactions involving perishable agricultural commodities purchased, received and accepted in interstate or foreign commerce" by making payments, through Spinale, to Cashin. *See* 7 U.S.C. § 499p (providing that a regulated merchant is liable for the acts, omissions and failures of any of its agents and officers). Specifically, the complaint charged G&T with having "made illegal payments to a USDA inspector in connection with four federal inspections of perishable agricultural commodities" between July 1999 and August 1999. It similarly charged Tray-Wrap with having made six illegal payments to a USDA inspector between March 1999 and June 1999. The petitioners responded by filing a joint answer which, in sum and substance, denied the charges against them but admitted that Spinale had been indicted on federal bribery charges and subsequently pleaded guilty to a single count of that indictment.

ALJ William Moran presided over a six-day disciplinary hearing beginning on October 25, 2004, during which he heard extensive testimony from Cashin and Spinale, as well as other witnesses. Spinale testified that he began to make what became customary gratuity payments in 1991, shortly after the petitioners moved to the Hunts Point Terminal market. According to Spinale, he and Lou Guerra, another produce merchant, "were talking and I had just - - I don't know if somebody had handed me an inspection or had an inspection, and I turned around and told them that these people up here, they're just impossible to work with. They don't know what they're looking at, you can't get a fair inspection, you can't get a timely inspection, and Mr. Guerra made some kind of signal to me and basically he was going like this here [rubbing two fingers together], and I said, well, you know, look. If I have to do that, I have to do it. So he

8

turned around and said he's going to send somebody to see me and the guy will mention my name and you'll know what you have to do." Spinale testified that he understood Mr. Guerra to mean that he had to give somebody money "[t]o get a fair inspection or a fast inspection." Spinale further described that "the next time I ordered an inspection, Mr. Cashin popped up, and he turned around and said Lou . . . said that I should [say] hello to you, or something similar to that. . . . [A]fter he finished the inspection, I just turned around and slipped a hundred dollars, just gave him the hundred dollars. . . . I just gave him a hundred dollars, didn't ask him anything, he didn't say anything to me and I didn't say anything to him." Spinale stated that he continued to make cash payments to several inspectors thereafter, including Cashin. However, Spinale repeatedly denied that he had made the payments to induce the inspectors to make inaccurate inspections of the arriving produce.[6] On the contrary, Spinale testified that, as a general matter, he gave the inspectors cash for the sole purpose of obtaining "fair, fast [and] accurate" inspections. Spinale described the inspectors' practice of withholding timely and accurate produce inspections unless they were paid as "soft extortion," and contended that giving in to that "soft extortion" "was something you had to do if you wanted to run a successful business. It was just a necessity."

Spinale's account was corroborated in several respects by the testimony of Paul Cutler

---

[6]Spinale did admit that, on at least one occasion—which was caught on tape as part of the sting operation—he "dictated" the contents of an inspection report to Cashin. Spinale explained that "the reason I was dictating these reports was because, in my mind, the man was [in]capable of writing a fair inspection. . . . And I turned around and dictated these reports so that we could get a fair appraisal of what was actually in the car. . . ." At another point in his testimony, Spinale asserted that he gave "in my opinion, what I thought was a correct and accurate report because Cashin wasn't able to do it. He was a nervous wreck."

and Edmund Esposito, two former Hunts Point USDA inspectors who, like Cashin, were active participants in the bribery scheme and pled guilty to bribery charges. Cutler explained that there was a chronic shortage of USDA inspectors in the Hunts Point office, and that because of this shortage it sometimes took "a day or two" to perform a requested inspection. As Cutler testified, this situation created a profit opportunity for inspectors willing to "put pressure" on merchants to extend gratuities in their direction: "a lot of times I would come down to do an inspection, like I had applicants would have to sell things, you know - - you know, the produce is perishable and they would have to get an inspection in a timely manner. . . . And when we came down there, like I said, they would be yelling a lot and saying where were you, you know. And I would be so ticked off at them, because we have a big load, and here you have an applicant yelling at you, and I would try in some of these stores to say hey, if you want a right inspection, I would tell them to pay me." Cutler was then asked what he would do if a merchant refused to pay him. "If he refused to pay me, it depends on the inspection on - - you know, on what defects I found. If it was on the border . . . I would pass it. If he paid me . . . I would add maybe - - say it was on the border, I add like two or three percentage points . . . to fail it." Cutler explained that he felt that he had significant power over the merchants in the market because "we could kind of force them to pay to get an inspection, or else they knew they wouldn't get the - - a right inspection."

Esposito similarly testified that when Hunts Point merchants refused to pay him, "I usually screwed them." Asked to elaborate, Esposito stated: "I would adjust the inspection. If they had an inspection that might fail good delivery, I might go in there and change - - you know, change the numbers and make sure that it passed a good delivery, and they would not get an adjustment on it. Or I would just change temperatures and make the inspection worthless."

10

Esposito also explained that although as many as "30, 35" merchants were paying the inspectors, not all of paying merchants received the same return on their investments. Instead, according to Esposito, "there were people that paid and you didn't do nothing for them, but they still paid. And then there was people that you did things for that paid, also." Esposito clarified that for the first group "[y]ou just did the normal fair inspection. You gave them a fair inspection and they paid you," but that he would write false inspection reports on behalf of the second group of merchants. Esposito did not explain why the inspectors treated some paying merchants differently than others. Esposito testified, however, that Spinale never asked him to alter, falsify or downgrade an inspection, though he also testified to having given Spinale "a benefit of doubt on inspections" without having been asked to do so because he "got paid and [Spinale is] a nice guy."

Cashin also testified at the hearing. Unlike Esposito, Cashin asserted that Spinale had paid the inspectors for more than just "fast, fair and accurate" inspections. Cashin testified that he and Spinale had an "understanding" that Spinale's payments were intended to influence, and in fact did influence, the outcome of Cashin's inspections. According to Cashin, this "understanding" originally arose from an agreement between Spinale and another USDA inspector, Bob Snolec, and that when Snolec left the USDA, Cashin took over at G&T and Tray-Wrap, telling Spinale, "I'll be coming here a lot, I think, and, you know, I'll help you like Bob helped you." Cashin did not describe Spinale's response to that statement. Cashin explained that he provided "help" for Spinale and other merchants that paid him illegal gratuities "in any one of three ways, and it's a combination of any one of the three factors. The first factor is increasing the number of containers reported on a certificate. . . . The second way was to increase on the

11

certificate, under the defects, the percentages of condition. . . . And the third way of help was the temperatures recorded on the certificate." By inaccurately recording the quantity and quality of the produce received by the wholesaler, Cashin testified that an inspector could reduce the price that a wholesaler would have to pay a supplier for the produce he had received. Cashin further testified that he would "usually" help Spinale by adjusting the percentage of defects found in Spinale's favor, explaining that Spinale "would be very specific and tell me what he wanted written down," "oftentimes" telling Cashin what to put in his inspection reports, and that when Cashin "helped" Spinale, his inspections did not accurately reflect the conditions of the produce received.

On March 28, 2005, Judge Moran issued a lengthy opinion dismissing the government's complaint against the petitioners. Judge Moran rejected Cashin's claim that Spinale had made the gratuity payments for the purpose of inducing him to make inaccurate inspections, and instead credited Esposito's testimony that Spinale "was paying only for a fair and accurate inspection," also finding broadly that "in all aspects where [Cashin's] testimony conflicted with Mr. Spinale's testimony, Mr. Spinale's testimony was credible and Cashin's was not." Judge Moran also took note of the substantial economic power that the inspectors wielded over the Hunts Point merchants. As Judge Moran colorfully put it, "Cashin and his cabal of corrupt cronies knew they had merchants like Mr. Spinale over a barrel. The merchants could pay them or risk either a delayed inspection or an inspection which rated produce as acceptable when an honest assessment would determine otherwise." In light of these findings, Judge Moran determined that the payments made by Spinale to Cashin were a "personal fee" extracted by Cashin "for every _visit_ to Mr. Spinale's place of business and that in no instance was Mr. Spinale

12

benefitting from those visits [by obtaining] . . . an inspection report which downgraded a load of produce from its actual condition." Having found that Spinale did not benefit in this way, Judge Moran declined to extend preclusive effect to the fact or substance of Spinale's admission of guilt to a federal bribery charge, and found that Spinale "was not *bribing* Cashin but that unlawful gratuities were made." To Judge Moran, this distinction was determinative, as he found that a licensee has an implied duty to refrain from paying bribes, but does not bear such a duty to refrain from paying illegal gratuities that do not benefit the licensee. He further found that even if the payment of illegal gratuities constitutes a breach of a PACA duty, the illicit payments that Spinale had made to Cashin did not "constitute sufficient cause to warrant revocation of the licenses of G&T and Tray-Wrap when the central contention of the [Petitioners] is that they were being extorted by the Agriculture inspectors in that, if they wanted an accurate inspection of the produce, they would have to pay off the inspectors to receive one."

The government appealed Judge Moran's decision to Judicial Officer William G. Jenson who, pursuant to 7 C.F.R. § 2.35(a), is authorized to make final determinations on behalf of the Secretary of Agriculture in adjudicatory proceedings. The Judicial Officer adopted Judge Moran's credibility determinations with respect to the witnesses who had testified at the hearing, and did not explicitly overturn any of Judge Moran's other factual findings. He nonetheless reversed Judge Moran's ultimate decision and revoked the petitioners' PACA licenses, taking a very different view of both the scope of the petitioners' implied duties under the PACA and the circumstances under which extortionate pressure may constitute reasonable cause for the breach of an implied

13

duty.[7]

With respect to the first, the Judicial Officer concluded that PACA licensees "have a duty to refrain from making payments to [USDA] inspectors in connection with the inspection of perishable agricultural commodities which will or could undermine the trust produce sellers place in the accuracy of the [USDA] inspection certificates and the integrity of [USDA] inspectors," and that "[a] PACA licensee's payment to a [USDA] inspector, whether caused by bribery or extortion and whether to obtain an accurate [USDA] inspection certificate or an inaccurate [USDA] inspection certificate, undermines the trust a produce seller places in the accuracy of the [USDA] inspection certificate and the integrity of the [USDA] inspector." As such, he concluded that "the purpose and reasons for Anthony Spinale's payments to William Cashin are not relevant to this proceeding. A payment to a [USDA] inspector in connection with the inspection of perishable agricultural commodities, whether the result of extortion evidenced in this proceeding or bribery and whether to obtain accurate or inaccurate [USDA] inspection certificates, is a violation of section 2(4) of the PACA."

The Judicial Officer also rejected the petitioners' claim that the inspectors' practice of "soft extortion" constituted reasonable cause for the payments made by Spinale, concluding that "[t]he extortion evidenced in this proceeding is not a 'reasonable cause' . . . for a commission merchant, dealer, or broker to fail to perform the implied duty to refrain from paying [USDA] inspectors in connection with the inspection of perishable agricultural commodities. Moreover, avoidance of inspection delays and avoidance of the issuance of inaccurate [USDA] inspection certificates are

---

[7] The Judicial Officer's order was stayed pending the outcome of this appeal.

not 'reasonable causes'" for the commission of such an breach. The Judicial Officer offered no

further explanation of what circumstances might be encompassed by the term "reasonable cause,"

however.[8]

Relying on Spinale's repeated admissions that he had made numerous payments[9] to Cashin

in connection with Cashin's inspections of agricultural commodities for the petitioners, the Judicial

Officer concluded that Spinale, and therefore the petitioners, had "engaged in willful, flagrant, and

repeated violations of section 2(4) of the PACA . . . by failing, without reasonable cause, to

perform an implied duty arising out of an undertaking in connection with transactions involving

perishable agricultural commodities purchased, received, and accepted in interstate or foreign

commerce." He therefore ordered the petitioners' PACA licenses revoked.

This timely petition for review of the Secretary's decision followed.

## II.

[8] We also note that the respondent was not able to point us to any guiding principle articulated by the Secretary with respect to the meaning of "reasonable cause" in its main brief, upon our call for supplemental briefing, or at oral argument. The respondent instead principally defended the Secretary's conclusion by analogizing to the manner in which this Court and others have treated the relationship between bribery and extortion in construing various federal criminal statutes. *See, e.g.*, Respondent's Supp. Br. at 6-7 (citing, *inter alia*, *United States v. Barash*, 365 F.2d 395 (2d Cir. 1966)). We need not and do not address the persuasiveness of these analogies here.

[9] Spinale insisted during his testimony before the ALJ that he did not "pay" Cashin or make "payments" to him, and that he instead "gave" him money, explaining, "I told you, I gave them money which I considered to be soft extortion. I didn't pay anybody to do anything. . . . I didn't pay him, I keep on telling you that it wasn't a payment. It was, as far as I'm concerned, soft extortion." The petitioners pick up on this theme in their opening brief, claiming that the Judicial Officer erred in describing Spinale as having "paid" or made "cash payments" to inspectors when he in fact "gave" them money. Given the Judicial Officer's conclusion that the giving of any money in connection with a perishable commodities inspection violates PACA Section 2(4), we find it unnecessary to address this dispute.

**A.**

The petitioners challenge two conclusions adopted by the Secretary in the course of a formal adjudication conducted pursuant to the agency's express statutory authority to administer and implement the PACA regulatory regime. *See* 7 U.S.C. § 499a(b)(2) (defining the term "Secretary" as used in the PACA to mean the Secretary of Agriculture); §§ 499d-f (empowering the Secretary of Agriculture to enact a PACA licensing scheme, enforce that scheme, and award damages to persons injured by PACA violations). First, the petitioners challenge the Secretary's generally applicable view that § 499b(4) encompasses a duty to refrain from making a payment to an inspector that only is intended to cause, and does in fact only cause, the inspector to create an accurate and timely inspection report. They argue that because a USDA inspector's duty is to provide timely and accurate inspections, the Secretary's construction is unreasonable. Second, they challenge the Secretary's case-specific determination, unaccompanied by a comprehensive discussion of the meaning of "reasonable cause," that the inspectors' actions did not constitute "reasonable cause" for Spinale's payments. The petitioners claim that Spinale reasonably feared that the petitioners would suffer significant economic loss if he did not pay regular gratuities to the inspectors, and that such a fear must be encompassed by the term "reasonable cause."

We consider both of the petitioners' arguments against the backdrop of the familiar two-step framework set forth by the Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). Under *Chevron*, "[f]irst, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not

16

directly addressed the precise question at issue, the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation.  Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Chevron*, 467 U.S. at 842-43 (footnotes omitted).  As a result, unless we find the Secretary's construction of the statute to be "arbitrary, capricious, or manifestly contrary to the statute," *id.* at 844, we must yield to that construction of the statute even if we would reach a different conclusion of our own accord.  *See Regions Hosp. v. Shalala*, 522 U.S. 448, 457 (1998).

It is firmly established that we review under the *Chevron* standard an agency's binding and generally applicable interpretation of a statute that it is charged with administering when that interpretation is adopted in the course of a formal adjudicatory proceeding.  *See United States v. Mead Corp.*, 533 U.S. 218, 230 n.12 (2001) (citing prior Supreme Court cases applying *Chevron* to agency adjudicatory decisions); *Freeman v. Burlington Broadcasters, Inc.*, 204 F.3d 311, 322 (2d Cir. 2000) ("An agency's interpretation of an ambiguous statute it is charged with administering is entitled to *Chevron* deference not only when the agency interprets through rule-making, but also when it interprets through adjudication.").  The Supreme Court has indicated that because some "ambiguous statutory terms" can be given concrete meaning only "through a process of case-by-case adjudication," the individual determinations reached by an agency engaged in that process also "should be accorded *Chevron* deference."  *INS v. Aguirre-Aguirre,* 526 U.S. 415, 425 (1999); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 449 (1987) (citing *Chevron*) ("There is obviously some ambiguity in a term like well-founded fear which can only be given concrete meaning through a process of case-by-case adjudication.  In that process of filling any gap left, implicitly or

17

explicitly, by Congress, the courts must respect the interpretation of the agency to which Congress has delegated the responsibility for administering the statutory program.") (quotation marks omitted); *In re Sealed Case*, 223 F.3d 775, 779-80 (D.C. Cir. 2000) (extending *Chevron* deference to the Federal Election Commission's case-specific probable cause determination).

### B.

Our task at the first step of the *Chevron* analysis is a simple one, as it is pellucidly clear that Congress has not spoken to the precise issues before us in this appeal: whether a PACA licensee bears an implied duty to refrain from paying illegal gratuities to a USDA inspector, and the scope of the circumstances that constitute "reasonable cause" for the breach of such a duty. 7 U.S.C. § 499b provides that "[i]t shall be unlawful in or in connection with any transaction in interstate or foreign commerce . . . (4) For any commission merchant, dealer, or broker . . . to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any [transaction involving any perishable agricultural commodity]." This statutory language plainly leaves undelineated what implied duties and specifications a PACA licensee might be required to bear, and under what circumstances a breach owes its occurrence to a "reasonable cause," and therefore must be excused. It is the province of the Secretary of Agriculture, who as we have noted above, has been charged with implementing and administering the PACA, to fill in these gaps. *Accord JSG Trading Corp. v. Dep't of Agric.*, 235 F.3d 608, 614 n.8 (D.C. Cir. 2001) ("Given the substantial ambiguity in § 499b(4), it is the Department's function, not ours, to define offenses under that provision."). Therefore, in light of Congress' silence, we turn to step two of the *Chevron* analysis, asking whether the Secretary has filled these statutory gaps in a manner reasonably consonant with the language, structure and

18

purposes of the Act.

## C.

### 1.

We affirm as reasonable the Secretary's conclusion that the PACA imposes an implied duty upon licensees to refrain from making payments to USDA inspectors in connection with produce inspections, irrespective of whether those payments induce, or are intended to induce, the inspectors to issue inaccurate inspection certificates. Indeed, given a statutory scheme which assigns government inspectors to protect the financial interests of distant shippers by providing impartial assessments of the condition of the produce upon arrival, *see* § 499n(a); *cf. "R" Best Produce, Inc. v. Shulman-Rabin Mktg., Corp.*, No. 04-6352-cv, 2006 U.S. App. LEXIS 26793, *6-7 (2d Cir. Oct. 26, 2006) (noting that Congress amended PACA in 1984 to provide sellers with "additional protection"), we can hardly conceive of a duty more clearly implicated than the obligation of recipients not to make side-payments to these inspectors. As the Judicial Officer noted, such payments give rise to a strong inference that the inspector's loyalty has been purchased by the payor, and therefore "undermine[] the trust a produce seller places in the accuracy of the [USDA] inspection certificate and the integrity of the [USDA] inspector." The facts of this case do not belie that presumption. Even accepting Judge Moran's conclusion that Spinale made his payments intending only to procure "fast, fair and accurate inspections," the record suggests that Spinale received additional benefits from the inspectors he paid. Esposito testified, for example, that he sometimes gave Spinale "a benefit of doubt on inspections," in part because he "got paid." Cutler similarly testified that he would shade his inspection results to benefit the merchants that

19

paid him. This undisputed testimony tends to confirm what common sense and common experience suggest: that strict impartiality and secret cash payments do not easily co-exist.

Given that a principal purpose of the PACA is to "protect[] . . . the producers of perishable agricultural products--most of whom must entrust their products to a buyer or commission merchant who may be thousands of miles away, and depend for their payment upon his business acumen and fair dealing," *see* S. Rep. No. 84-2507, at 3, we think it is appropriate for the Secretary to construe the implied duties owed by PACA licensees in a manner designed to secure shippers' confidence in the USDA agents hired, in effect, to stand in their shoes when the produce arrives at its destination. We therefore conclude that the Secretary has permissibly construed § 499b(4) as encompassing an implied duty to refrain from paying illicit gratuities to USDA inspectors in conjunction with inspections of perishable agricultural products, even where those payments are not intended to result, and do not result, in the filing of an inaccurate inspection certificate.

2.

We also affirm the Secretary's conclusion that the inspectors' practice of withholding "fast, fair and accurate" inspections from merchants who refused to pay illegal gratuities does not excuse the petitioners' decision to breach the implied duties owed under the PACA by making such payments. Once again we begin with the statute, which provides that "[i]t shall be unlawful in or in connection with any transaction in interstate or foreign commerce . . . (4) For any commission merchant, dealer, or broker . . . to fail, *without reasonable cause*, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any [transaction involving any perishable agricultural commodity]." 7 U.S.C. § 499b (emphasis added). In

20

construing this clause—the expansiveness of which suggests that Congress intended to grant the Secretary broad leeway to address the infinite variety of facts and circumstances that might surround a PACA violation—the Secretary rejected the petitioners' claim that "any violation of the statute was unavoidable due to extortion," instead finding that the "avoidance of inspection delays and avoidance of the issuance of inaccurate [USDA] inspection certifications are not 'reasonable causes'" for the payment of unwarranted gratuities to a USDA inspector.

We think the Secretary's case-specific determination that "reasonable cause" had not been demonstrated typically would be entitled to *Chevron* deference because agencies are generally accorded *Chevron* deference when they give "ambiguous statutory terms concrete meaning through a process of case-by-case adjudication." *See*, *e.g.*, *INS v. Aguirre-Aguirre*, 526 U.S. 415, 425 (1999) (internal quotation marks omitted); *In re Sealed Case*, 223 F.3d 775, 779-780 (D.C. Cir. 2000) (extending *Chevron* deference to the Federal Election Commission's case-specific probable cause determination). Although such case-by-case adjudication may ultimately be necessary to give concrete meaning to the term "reasonable cause" as used in 7 U.S.C. § 499b, our task in reviewing the Secretary's determination in this case would have been considerably aided had the Secretary provided some guiding principle for identifying what constitutes "reasonable cause," or at least a rationale for rejecting petitioners' alternative construction. However, we need not reach the question whether the Secretary's cursory treatment of the term "reasonable cause" is still entitled to *Chevron* deference, as we would reach the same conclusion as the Secretary under either a *de novo* or deferential standard.

Coercion, as the various hypotheticals drawn up by the parties in their written submissions and at oral argument reaffirm, exists in many degrees and can take many forms. We may presume

21

that there are species of coercion so extreme that they rob an individual of any meaningful opportunity to resist, as well as varieties too moderate to ever excuse the performance of an illegal act. We need not engage these or other hypotheticals, however, because we have before us a well-developed factual record of the circumstances faced by Spinale. The facts in the record reveal that the "extortion" practiced by Cashin and his cohorts, while real, was indeed "soft" enough to support the view that no reasonable cause existed for the petitioners' breach of duty. Spinale has never suggested that he was physically threatened, and Esposito specifically denied that the inspectors employed such threats to obtain their gratuities. Nor did the inspectors threaten Spinale with the loss or destruction of his business, harm to his family or employees, blackmail, or the outright denial of produce inspections. Indeed, Spinale's payment relationship with Cashin was not even initiated by an inspector's suggestion; rather, according to Spinale's own testimony, he decided of his own accord, at the suggestion of a fellow produce merchant, that it would be worthwhile to start making cash payments to the inspectors, and began to do so at the next available opportunity. We also note Cashin's testimony that while many of the Hunts Point merchants gave in to the inspectors demands, some twenty-five to forty percent of the merchants managed to resist. In the same vein, we note petitioners' concession at oral argument that Spinale never attempted to report the illegal activities at Hunts Point to the Bronx District Attorney's Office, the United States Attorney's Office for the Southern District of New York, the USDA Inspector General, the NYPD, or any other official body. While we need not and do not address whether he bore an affirmative obligation to do so, we simply point out that there were clearly available—and potentially anonymous—means of resisting the inspectors' illegal scheme that Spinale never explored. We think this fact serves to bolster the Secretary's decision to reject the

22

petitioners' assertion that Spinale had no choice but to make cash payments to the inspectors for over a decade.

In short, we view the record as demonstrating that the inspectors' corrupt practices left Spinale with choices about how to respond to their demands for illegal payments—hard choices, perhaps, but meaningful ones all the same. Given that backdrop, we concur in the Secretary's view that "[t]he extortion evidenced *in this proceeding* is not a 'reasonable cause'. . . for a commission merchant, dealer, or broker to fail to perform the implied duty to refrain from paying [USDA] inspectors in connection with the inspection of perishable agricultural commodities." (emphasis added). We therefore affirm the Secretary's decision to strip the petitioners of their PACA licenses.

III.

We have considered all of petitioners' other arguments and find them to be without merit. Therefore, for the reasons set forth above, the petition for review is **DENIED** and the decision of the Secretary of Agriculture is hereby **AFFIRMED**.