RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0332P (6th Cir.)
File Name: 00a0332p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

UNITED PARCEL SERVICE, INC.,

Petitioner/
Cross-Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD,

Respondent/
Cross-Petitioner,

DAVID DUNNING,

Intervenor.

Nos. 99-5031/5226

On Petition for Review and Cross-Application for
Enforcement of an Order of
the National Labor Relations Board.
Nos. 7-CA-33137; 7-CA-33981(2);
7-CA-34605; 7-CA-34903.

Argued: March 6, 2000

Decided and Filed: June 29, 2000[*]

_____

[*]This decision was originally issued as an "unpublished decision" filed on June 29, 2000. On September 11, 2000, the court designated the opinion as one recommended for full-text publication.

Before:  SILER and GILMAN, Circuit Judges;
          O'MALLEY, District Judge.[**]

---

## COUNSEL

**ARGUED:**  Carey A. DeWitt, BUTZEL LONG, Detroit, Michigan, for Petitioner.  Richard A. Cohen, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., for Respondent. **ON BRIEF:**  Carey A. DeWitt, Joseph M. Rogowski II, BUTZEL LONG, Detroit, Michigan, for Petitioner.  Richard A. Cohen, NATIONAL LABOR RELATIONS BOARD, OFFICE OF THE GENERAL COUNSEL, Washington, D.C., Aileen A. Armstrong, NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.  Barbara M. Harvey, Detroit, Michigan, for Intervenor.

---

## OPINION

---

KATHLEEN MCDONALD O'MALLEY, District Judge. This action is a direct appeal from a decision of the National Labor Relations Board ["NLRB"].  The NLRB found that United Parcel Service, Inc. ["UPS"] committed several unfair labor practices.  The Administrative Law Judge ["ALJ"] found that UPS's prohibition of the distribution of union literature in two areas she classified as "non-work" or "mixed" areas, and UPS's removal of a union document from a union bulletin board were unfair labor practices in violation of the National Labor Relations Act, 29 U.S.C. §158(a)(1).

---

[**]The Honorable Kathleen McDonald O'Malley, United States District Judge for the Northern District of Ohio, sitting by designation.

The NLRB affirmed the ALJ's decision below. We **AFFIRM** the NLRB's decision and order in full.

## I.  STANDARD OF REVIEW

The substantial evidence test governs our review of Board decisions.  29 U.S.C. § 160(e); *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951).  Where there is substantial evidence on the record as a whole to support the Board's conclusions, we must uphold them.  *Universal Camera*, 340 U.S. at 488.  The Board's conclusions are entitled to deference if they are based upon a reasonably defensible construction of the Act.  *NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 266-67 (1975).  "The Board's application of the law to the facts is also reviewed under the substantial evidence standard, and the Board's reasonable inferences may not be displaced on review."  *NLRB v. United States Postal Service*, 841 F.2d 141, 144 (6th Cir.1988) (*citing NLRB v. United Ins. Co.*, 390 U.S. 254, 260 (1968)).  "Evidence is considered substantial if it is adequate, in a reasonable mind, to uphold the decision."  *Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1289 (6th Cir.1987);  *Universal Camera Corp.*, 340 U.S. at 477.  Purely legal issues, however, are reviewed de novo.  *Cleveland Real Estate Partners v. NLRB*, 95 F.3d 457, 462 (6th Cir. 1996).

It is also the Board's function to resolve credibility issues. *NLRB  v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984). "[T]hus this Court ordinarily will not disturb credibility evaluations by an ALJ who observed the witnesses' demeanor." *Roadway Express, Inc.*, 831 F.2d at 1289; *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1262 (6th Cir. 1988).

## II.  BACKGROUND

UPS's violations of the NLRA arise from three separate incidents involving attempts by a union member, David Dunning, to distribute union literature in a UPS distribution facility in Saginaw, Michigan.  David Dunning is an

employee who drives a truck for UPS. He also has served as a union steward for 16 years.

UPS has a written rule at the Saginaw facility that prohibits the distribution of any literature in work areas during working time. The rule provides:

No employee shall distribute or circulate any written or printed material in work areas at any time, or during his or her working time, or during the working time of the employee or employees at whom such activity is directed.

JA at 532. The NLRB did not find this rule to be facially invalid; it only found that UPS unlawfully enforced it in non-work areas during non-working time. UPS applied this rule against Dunning and twice stopped him from distributing union literature in areas the NLRB later determined to be non-work areas.

In the first such incident, UPS management stopped Dunning from distributing a union newspaper, the Convoy Dispatch, in a "check-in" area between 7:30 a.m. and 8:30 a.m. and disciplined Dunning for this activity. In the second incident, Dunning attempted to distribute a union newspaper to two part-time employees in or near the break room. Neither the employees nor Dunning were working at the time.

An unrelated incident involved UPS's removal of union literature from a union bulletin board. A UPS supervisor removed a union publication from a bulletin board that was expressly reserved for union communications. The ALJ found that the sole reason for removal of the literature was UPS's belief that the message it conveyed was deleterious to the company.

The NLRB found that UPS committed unfair labor practices in violation of 29 U.S.C. § 158(a)(1) as a result of each of these incidents, because it interfered with or restrained the exercise of rights guaranteed by 29 U.S.C. § 157. It is these determinations which we now review on appeal.

literature from the union bulletin board because it was critical of UPS, are supported by substantial evidence and are **AFFIRMED**. The NLRB's application for enforcement of both the contested and the uncontested portions of its order is **GRANTED**; we enforce the NLRB's order in full.

Brian Hack, to remove the document and send it to him, *see* JA 415, but, by this time, Dubay had already removed the document at Soumis's direction.  Thus, even if Parks's testimony was credible, it is irrelevant to why the document was removed in the first instance.  Thus, substantial evidence supports the ALJ's determination that the lack of union letterhead was not the basis for the removal of the literature and that the removal constituted an unfair labor practice.[3]

## IV.  CONCLUSION

The NLRB's conclusions that UPS committed unfair labor practices in violation of 29 U.S.C. § 158(a)(1) because it (1) prohibited the distribution of union literature in the check-in area, a non-work or mixed area, and disciplined Dunning for such distribution, (2) prohibited distribution of union literature in or within a few feet of the part-time employee break area during non-working times and, (3) removed union

---

[3]UPS also contends that the ALJ's decision that it removed this material because it denigrated UPS, and not because it violated the rule requiring official union letterhead, was made possible because the ALJ improperly excluded Exhibit 16. The ALJ explained Exhibit 16 and why she excluded it in a footnote to her decision.

> [Exhibit 16] is a series of photocopied grievance decisions on the subject of postings on union bulletin boards.  Neither the facts underlying the decisions nor the text of the contract provision they purport to interpret are set out in full in the exhibit.  The exhibit was apparently offered to show the basis upon which Respondent decided to remove the Contract Update at issue here, from the union bulletin.  However, Respondent's witness, Daniel Parks, from whose files this evidence came could not testify with any certainty which parts of the exhibit, if any, he may have reviewed at the time relevant to the decision to remove the Contract Update.  I therefore excluded it as irrelevant.

JA at 721.  UPS contends that Exhibit 16 should have been admitted as a state of mind exception.  A state of mind exception is an exception to the hearsay rule.  *See* Fed. R. Evid. 803(3).  It is not an exception to the rules of relevance, however.  UPS's argument, thus, is erroneous.

---

## III.  LAW AND ARGUMENT

### A.  Distribution of union literature in the check-in area

The first incident involved the distribution of a union newspaper in the check-in area.  The check-in area is an area where drivers congregate before 8:30 a.m., at which time they attend a morning meeting in another location before proceeding to their trucks to begin deliveries.  Drivers often come to this area before the 8:30 a.m. meeting – sometimes arriving as much as an hour early.  During this time, the ALJ found the check-in area to be a place where drivers are "free to talk, read newspapers and magazines, or stand around until their assigned driving time."  *See* JA at 777.  She therefore held that the check-in area was a "non-work" or at the most a "mixed" area.

If an area is a work area, UPS may prohibit the distribution of union literature.  *See Stoddard-Quick Manufacturing Co. v. International Woodworkers of America*, 138 N.L.R.B. 615 (1962).   If it is a non-work area and the union literature is dispersed during non-working time, UPS may not stop the distribution. *See Eastex, Inc. v. NLRB*, 437 U.S. 556, 570-72, 57 L.Ed.2d 428 (1978) (holding that employees have the right to distribute union literature in non-work areas of the employer's premises during non-working periods and employers may not interfere with this right except to the extent necessary to maintain production or discipline); *Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 801-05, 89 L.Ed. 1372 (1945) (same).  If the area is a mixed area, meaning that, while some people may use the area for work, most of the employees use it for non-work purposes – such as a lunch area or a break area – UPS still may not prohibit the distribution of union literature.  *See Rockingham Sleeper, Inc.*, 188 N.L.R.B. 698 (1971); *Oak Apparel, Inc.*, 218 N.L.R.B. 701 (1975); *Transon Lines*, 235 N.L.R.B. 1163 (1978), *aff'd in relevant part*, 599 F.2d 719 (5th Cir. 1979).

The ALJ found that the check-in area was a non-work area, or at the most a mixed area, based on the testimony she found the most persuasive: testimony that drivers do not work in the area between 7:30 a.m. and 8:30 a.m., but merely congregate there before the day's shift. While there was testimony that supervisors may occasionally give instructions to a driver before his start time, the ALJ found this was the exception to normal practice. The ALJ found, moreover, that, even if such conversations occasionally occur, UPS does not compensate drivers for these brief interchanges with their supervisors, since the drivers are not actually "on the clock" until 8:30 a.m. The ALJ found that even if supervisors and other classes of employees work in this area before or after this one hour period, and even if supervisors may choose to engage in uncompensated conversations with drivers during this period, such activities would, at the most, turn the area into a mixed area. Because the area was a non-work or mixed area between 7:30 a.m. and 8:30 a.m., the ALJ found that UPS violated § 8(a)(1) of the NLRA by enforcing its non-distribution rule in the area during this time. The NLRB affirmed this decision.

UPS contends that the determination that the area was a non-work or mixed work area was erroneous. Because it assails the ALJ's finding of facts, we review this argument under the substantial evidence test. *Cleveland Real Estate Partners v. NLRB*, 95 F.3d 457, 462 (6th Cir. 1996); *Emery Realty, Inc. v. NLRB*, 863 F.2d 1259, 1263 (6th Cir. 1988). We must uphold the ALJ's findings of fact if substantial evidence exists in the record when viewed as a whole, to support them. *See Universal Camera*, 340 U.S. at 488. The ALJ's credibility considerations, moreover, should not be disturbed. *NLRB v. Baja's Place*, 733 F.2d 416, 421 (6th Cir. 1984); *Roadway Express, Inc.*, 831 F.2d 1285, 1289 (6th Cir. 1987).

In her opinion, the ALJ detailed her factual findings and explained in fair detail why she countenanced the testimony of some witnesses and rejected that of others in coming to her

A dispute existed over which contract update was removed, because one update contained union letterhead and one had only a small Teamster's logo. The ALJ found no reason to decide which contract update was removed because, according to her findings of fact and weighing of witness credibility, the presence or absence of the letterhead had nothing to do with removal of the literature; the ALJ expressly found that the only reason the literature was removed is because UPS believed it was critical of the company and that the letterhead debate was a post-hoc attempt by UPS to justify its actions. The NLRB affirmed.

UPS contends that substantial evidence does not support the ALJ's conclusion that the lack of union letterhead was, in the ALJ's words, "an *ex post facto* justification added sometime after the posting was removed." *See* JA 79. The ALJ based her decision on the testimony of supervisor, Terry Dubay, who actually removed the union publication. Dubay testified that he did not know of the union letterhead requirement when he removed the publication, but took it down because he felt "it was anti-company in nature and discriminatory towards the company." JA at 401. Dubay called Manager Bill Soumis to ask whether he should remove the document, but Dubay did not remember discussing whether the union letterhead was on the document, and did not know at the time that a lack of union letterhead could be a reason for removing documents from the union bulletin board. *See* JA at 411-412. The ALJ, thus, did not find credible Manager Soumis's testimony that he asked Dubay to remove the document because it lacked letterhead, since Soumis made the request over the phone without seeing the document. The ALJ also did not find credible Soumis's testimony that he told the labor manager, Daniel Parks, still without seeing the document, that it lacked letterhead.

UPS argues that the ALJ ignored Daniel Parks's testimony that Parks directed Dubay to take down the union publication because it lacked letterhead. UPS misconstrues Parks's testimony; Parks asked Bill Soumis, or another manager,

or any employee's work in any manner. The NLRB agreed with this determination.

UPS objects to this finding and maintains that Dunning and the two employees were outside the break area, and, thus, UPS had the right to stop any distribution. UPS contends that, since the general rule is that an employer may prohibit distribution in a work area, finding that it did not matter whether the area was a break area or a work area is arbitrary and capricious.

The NLRB encourages us to use the same analysis we used in *Pikeville United Meth. Hosp. v. United Steelworkers*, 109 F.3d 1146, 1158 (6th Cir. 1997), when we held that the front entrance of the hospital was a work area, and that passing out handbills a few feet away from the front entrance was still "in the area" and, when occurring during active work periods, could be prohibited. Whether it works in favor of or against an employer in any given application, the analysis remains sound. It is unnecessary to create strict imaginary lines around break areas and work areas; the totality of the circumstances surrounding the distribution must be taken into account. Since the distribution occurred, at the most, a few feet from a break area in an open room, while all employees involved were on break, and no one else was working in the room, substantial evidence supports a finding that this was a non-work area.

### D.  The removal of union literature from the union bulletin board

In the third incident, Dunning placed a copy of a Teamsters UPS contract update in a glass-enclosed bulletin board reserved for the Union's use. Under the union contract, UPS could police the union bulletin board and take down any literature that did not have union letterhead. The ALJ, though, found that UPS removed the contract update because it believed remarks in the document about UPS's safety record were deleterious to the company.

determination. The ALJ's determination that the area was a non-work, or at the most a mixed area, is supported by substantial evidence in the record, namely the testimony of several witnesses. UPS provides a litany of work that is supposedly done in this area, but the ALJ discounted this evidence as irrelevant to the time between 7:30 a.m. and 8:30 a.m., or found that it was not credible, or found that it was only enough to bring the area to "mixed" status. Thus, the ALJ's factual findings and credibility determinations should be affirmed.

UPS also contends that other NLRB cases have held that a work area cannot be designated a "mixed" area just because non-working employees happen to be there. *See UARCO, Inc.*, 286 N.L.R.B. 55, 68-69 (1987) (holding that aisle where Hyster vehicles travel on a regular basis was a work area even when non-working employees were there); *Vapor Corporation*, 242 N.L.R.B. 776, 790 (1979) (holding that a room where forklifts entered regularly was a work area even when filled primarily with employees waiting to clock out); *Timken Co.*, 236 N.L.R.B. 757, 764 (1978) (holding that hallway with regular cart and tow-motor traffic was a work area even when non-working employees were there). The facts in those cases differ substantially from the facts at issue here, however. Those cases dealt with areas still retaining the characteristics of a work area but where non-working employees happened to be found, not areas transformed into lounge or break areas during certain times of the day.

Here, the check-in area transformed into a congregation point for the drivers to drink coffee, read magazines and newspapers, and converse before their morning shift. This activity is different from distributing papers to employees waiting to clock-out in the five minutes before the shift change, where many other employees present are still working, and where a forklift could enter at any time. *See Vapor Corporation*, 242 N.L.R.B. at 790. It also differs from employees distributing material in a hallway used for cart and tow-motor traffic that was "not specifically set aside for non-

work related functions or activities." *See Timken Co.*, 236 N.L.R.B. at 764. The NLRB's determination that this is a non-work area, thus, is not in conflict with the findings in these earlier cases.

UPS next argues that, even if the check-in area is a mixed work area, the NLRB still may not force UPS to allow distribution of union literature there. UPS contends that, to prohibit distribution in a mixed area, it need only show that other areas exist in the building where UPS *allows* distribution of union literature. UPS asserts that, because employees may pass out union literature in the employee locker room and in the break room, it may make the check-in area a non-distribution area, no matter how the room is characterized.

UPS attempts to glean this argument from *Rockingham Sleepwear, Inc.*, 188 N.L.R.B. 698 (1971), and *Transon Lines*, 235 N.L.R.B. 1163 (1978). There, in finding that employers may not enforce non-distribution rules in mixed use areas, the NLRB noted that no other non-work area on the premises existed where those employees *could* distribute union literature. UPS contends that these cases stand for the proposition that the absence of other areas of distribution is a *precondition* to a right of distribution in mixed areas. UPS reads too much into *Rockingham* and *Transon Lines*. While these cases do state in their factual findings that there were no non-work areas on the employers' premises, that fact was not essential to the outcome. Indeed, the NLRB has expressly found that a company may not prohibit the distribution of union literature in a mixed-use area, even though other non-work areas existed in the building, including a driver's lounge and a washroom. *See Arkansas Best Freight System, Inc.*, 257 N.L.R.B. 420, 424 (1981). And, in *Oak Apparel, Inc.*, 218 N.L.R.B. 701, the NLRB did not even mention a lack of alternate non-work areas, much less precondition its holding regarding the right of distribution in mixed use areas on that fact. The availability of alternatives for employee communication, moreover, does not generally affect an

Here, the ALJ found that the drivers "routinely distributed such materials as fishing contest forms, football pool material, and information about golf tournaments." These are not isolated instances, like those found in the cases upon which UPS relies, nor is management simply overlooking a few beneficent charitable solicitations. The circumstances at issue here differ fundamentally from those presented to the NLRB in the cases to which UPS points this Court.

Again, we find no reason to disturb the ALJ's conclusion that UPS enforced its non-distribution rule against Dunning in a discriminatory manner or to set aside the NLRB's finding that such conduct constitutes an unfair labor practice.

### C. Enforcement of non-distribution rule in or near employee break room

In the second incident, Dunning attempted to distribute copies of the same newspaper to two part-time employees somewhere along the border of the part-time employee break area – a break area that had no strict delineation between break and work area. It is undisputed that neither Dunning nor the other two employees were working at the time of the attempted distribution. It is also undisputed that no other employees whose work the distribution could have disrupted were in the area. What is disputed is whether this attempted distribution occurred in the break area, or just outside the break area. Dunning testified that he was in the break area. UPS witnesses testified that Dunning was a few feet outside the fictional line that separated the break area from work areas. The ALJ decided that resolving the credibility issue was unnecessary because it would "elevate form over substance" to base her determination on whether Dunning and the two employees were standing a few feet inside or outside an imaginary line that designates the break area in an open room. She, thus, held that UPS violated the NLRA by stopping this distribution when no one was working in the area and the distribution could not have affected the work area

between "management" and "supervisors" appears unwarranted.[2]

UPS also argues that, even if management knew about the other distributions, enforcement of a non-distribution rule against union literature is not necessarily discriminatory. UPS cites a number of cases in support of this proposition. *See, e.g., Serv-Air, Inc.*, 175 N.L.R.B. 801, 801-802 (1969) (holding that no evidence existed that management knew of solicitation during work-time and condoning a few solicitations for ill colleagues does not show discrimination); *Lutheran Hospital of Milwaukee, Inc.*, 224 N.L.R.B. 176, 181 (1976) (holding that no evidence existed that management knew of work time solicitation and allowing a few solicitations for United Fund does not show discrimination); *Astronautics Corporation of America*, 164 N.L.R.B. 623, 627 (1967) (same); *INS v. Federal Labor Relations Authority*, 855 F.2d 1454, 1467 (9th Cir. 1988) (holding that rule prohibiting the wearing of pins was enforceable and overlooking enforcement of the rule on rare occasions was not viewpoint discrimination in violation of the First Amendment); *Restaurant Corp. of America*, 827 F.2d 799, 807, 808 (D.C. Cir. 1986), *vacated by* 438 U.S. 902 (1975) (holding that rule was not discriminatorily enforced when employee solicitation was actually disruptive); *Timken Co.*, 236 N.L.R.B. 757, 764 (1978) (holding that no evidence existed that management knew of work-time solicitation and allowing a few solicitations for United Way does not show discrimination). These cases, generally, held that the employer did not enforce the no-solicitation rule in a discriminatory manner either because there was no evidence that management knew about other solicitations occurring on working time, or because those solicitations were very few and mainly beneficial in nature, such as collections for ill or retiring colleagues.

---

[2]One of the managers, Brian Konesko, also does not see a distinction between management and supervisor. He stated that he went into *management* in 1985 as a *supervisor* of personnel. *See* JA at 376.

employee's right to distribute literature. *See, e.g., Roadway Express, Inc. v. NLRB*, 831 F.2d 1285, 1290 (6th Cir. 1987) (ability to freely distribute literature does not alter employee's right to post union literature on employer bulletin boards).[1]

For these reasons, we find no basis to disturb the ALJ's determination that the check-in area was a mixed-use area or to disagree with the conclusion that UPS committed an unfair labor practice by prohibiting the distribution of union literature in that area.

### B.  UPS applied its non-distribution rule in a discriminatory manner against Dunning

The NLRB also found that UPS discriminated against Dunning in the application of its non-distribution rule when it disciplined him for distributing the union paper, but had not disciplined any other employee for the distribution of non-union literature.  While UPS may validly enforce a rule prohibiting the distribution of literature on working time and in work areas, *See Republic Aviation Corp. v. NLRB*, 324 U.S. 793, 798, 803, n. 10 (1945); *Stoddard-Quirk Mfg. Co.*, 138 N.L.R.B. 615, 616-621, UPS may not promulgate an otherwise valid non-distribution rule for a discriminatory purpose, or enforce such a rule in a discriminatory manner. *Stoddard-Quirk Mfg Co.*, 138 N.L.R.B., at 621 fn. 8.

The ALJ found that, during the hour before 8:30 a.m., when drivers officially begin work, "drivers pass around such items

---

[1]UPS also argues that this Court should find that no unfair labor practice occurred because it was a *de minimis* violation, like that in *Graham Architectural Prods. v. NLRB*, 697 F.2d 534 (3d Cir. 1983). In *Graham*, a supervisor asked an employee to stop distributing union literature in the parking lot and to move a short distance away to the entrance of the employer's building, where the employee was actually able to distribute more effectively and efficiently. *See id.* Here, however, UPS told Dunning to move to the locker room, a completely different area, and Dunning was later disciplined for the distributions, unlike *Graham*.

as entry blanks for a fishing tournament, information about a hunting contest, flyers announcing a golf outing and sports magazines." JA at 777.   UPS supervisors never prohibited the distribution of this sort of material. The ALJ specifically stated that she credited the testimony of the General Counsel's witnesses and did not credit UPS's witnesses – all supervisors – who testified that, although they saw drivers reading newspapers and magazines, they never saw drivers pass around or share reading material. *See id.*

UPS contends that the NLRB impermissibly shifted the burden of proof to UPS on this issue, since no UPS supervisor admitted to seeing the drivers pass around newspapers or other reading materials.  And, several managers testified that they threw away any reading materials if they happened to see them in the check-in area after the drivers had left.  The ALJ pointed out, though, that there was also no evidence that UPS "posted any warning notices, gave verbal warnings, or otherwise informed employees that the newspapers and magazines were being discarded pursuant to the no-distribution rule." *See* JA 778.  The ALJ inferred that the supervisors knew about the sharing of reading materials in the area since there *was* evidence that the supervisors routinely mingled with drivers while such distributions took place. *See* JA at 777, 930.  Thus, this is not a matter of shifting the burden of proof.  It is merely a matter of whether the Court finds the ALJ's inference to be reasonable.

We apply a substantial evidence test here, and "may not displace any of the Board's reasonable inferences." *See NLRB v. Ohio Masonic Home*, 892 F.2d 449, 451 (1989); *NLRB v. United States Postal Service*, 841 F.2d 141, 144 (6th Cir.1988); *NLRB v. United Insurance Co.*, 390 U.S. 254, 260, 19 L.Ed.2d 1083 (1968). So the question is whether it is reasonable to infer that the same management who saw employees reading newspapers and magazines also saw them share or pass around those reading materials.  The ALJ explained this inference by stating:

The evidence whether or not management was aware of the distributions of magazines, contest forms, and other such materials is less clear.   Nevertheless, it is undisputed that supervisors routinely mingled with the drivers in the check-in areas during the pre-start period. Since the credited evidence shows that distributions of magazines and other materials was done openly and routinely, I infer that supervisors were aware of these distributions and took no action to stop them.

JA at 778.  The inference that supervisors who mingled with the drivers during this time saw the drivers pass around these materials is reasonable, particularly in light of the testimony from drivers that they engaged in this practice regularly and openly. *Cf. NLRB v. Challenge-Cook Bros. of Ohio*, 374 F.2d 147, 150-151 (6th Cir. 1967) (finding inference that supervisor who walked past a sign every day saw that sign was reasonable and provided substantial evidence for the NLRB's decision).

UPS also contends that this finding is not supported by substantial evidence since it only establishes that "supervisors" may have known of the distribution, and not "management."  The case UPS relies on for this distinction between supervisors and management, *Adams Super Markets*, 274 N.L.R.B., 1334, 1338 (1985), does not make this distinction itself, however. It was, moreover, self-proclaimed "managers" who testified that, although they observed drivers reading in the check-in area and saw newspapers and magazines that had been left behind, they were unaware that those materials were being "distributed" among employees. *See* JA 291, 385-387.  And, it was "managers" who testified about what was happening in the check-in room from 7:30 a.m. to 8:30 a.m., indicating they regularly observed the activity in that area at that time. *See* JA at 363, 393-94. After reviewing the testimony of these "managers," a distinction