# United States Court of Appeals
## For the First Circuit

No. 13-2498

IN RE: GRAND JURY PROCEEDINGS

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

[Hon. John J. McConnell, Jr., <u>U.S. District Judge</u>]

Before

Howard, <u>Circuit Judge</u>,
Souter[*], <u>Associate Justice</u>,
and Stahl, <u>Circuit Judge</u>.

<u>William P. Devereaux</u>, with whom <u>James W. Ryan</u>, <u>Matthew C. Reeber</u>, <u>Misty G. Delgado</u> and <u>Pannone Lopes Devereaux & West LLC</u> were on brief, for appellant
<u>Donald C. Lockhart</u>, Assistant United States Attorney, with whom <u>Peter F. Neronha</u>, United States Attorney, was on brief, for appellee.

February 20, 2014

---

[*] Hon. David H. Souter, Associate Justice (Ret.) of the Supreme Court of the United States, sitting by designation.

**HOWARD, Circuit Judge**.  A venerable legal Latinism, lex non cogit ad impossibilia, teaches that the law does not compel the impossible.  Guided by that august adage, we hold that a subpoena duces tecum compelling the production of documents to a now-defunct grand jury cannot be enforced by civil contempt sanctions before a successor grand jury, and we accordingly vacate the district court's order holding the appellant in civil contempt.  We reject, however, the appellant's additional contentions that tribal sovereign immunity shielded it from subpoena and that the subpoena was unreasonably broad in scope.

## I.

Because this case is under seal, we provide only a cursory rehearsal of the facts.  On October 2, 2012, appellant Narragansett Indian Tribal Historic Preservation Office ("NITHPO") was served with a subpoena duces tecum issued by a grand jury in the District of Rhode Island the previous month.[1]  The subpoena directed the custodian of NITHPO's records to appear before the grand jury with a series of documents on the morning of October 24, 2012.  During the course of ensuing negotiations with NITHPO as to the scope of the subpoena, the government repeatedly extended the return date for the subpoena.  When these negotiations proved

---

[1] Another subpoena duces tecum, not at issue on this appeal, was served on the Narragansett Indian Tribe.  The Tribe and NITHPO proceeded jointly in resisting their respective subpoenas until September 2013, at which point the Tribe complied with the district court's order compelling production of the subpoenaed records.

fruitless, the government ultimately set a return date of February 27, 2013. On the last day before that deadline, NITHPO informed the government that it would not produce the subpoenaed records before the grand jury, asserting inter alia that tribal sovereign immunity shielded it from the grand jury's subpoena power.

The sitting grand jury was subsequently discharged, and a new grand jury was empanelled in its place on April 16, 2013. On May 9, the government moved to compel NITHPO's compliance with the 2012 subpoena, representing in its motion that although the subpoena had been issued by a previous grand jury, the investigation had been transferred to the newly-empanelled grand jury. NITHPO objected to the government's motion and moved to quash the subpoena on grounds of tribal sovereign immunity and unreasonableness.

On August 2, the district court entered an order granting the government's motion to compel and, except for some narrowing of the scope of the subpoena, denying NITHPO's motion to quash. The court ordered NITHPO to "comply with the October 24, 2012 grand jury subpoenas . . . at a mutually agreed upon date and time within 30 days."[2] After NITHPO's custodian of records failed to appear on the agreed-upon date, September 18, the government moved for a court order requiring NITHPO to show cause why it should not be

---

[2] NITHPO filed a motion for reconsideration of this order, which the district court denied on September 16.

held in civil contempt for its noncompliance. The district court issued a show cause order on October 22, and after a contempt hearing the following month, adjudged NITHPO in civil contempt and imposed a fine of $500 per day of noncompliance beginning on December 4. This appeal followed.

**II.**

NITHPO raises three primary arguments on appeal, contending that 1) the underlying subpoena was no longer enforceable following the discharge of the issuing grand jury in April 2013; 2) NITHPO enjoyed tribal sovereign immunity from the grand jury's subpoena power; and 3) the subpoena was unreasonably broad in scope under Fed. R. Crim. P. 17(c)(2). We address each argument in turn, reviewing de novo the district court's legal determinations as to enforceability and sovereign immunity, see Project B.A.S.I.C. v. Kemp, 947 F.2d 11, 15 (1st Cir. 1991), and reviewing for abuse of discretion the district court's decision as to reasonableness under Rule 17(c)(2), see United States v. LaRouche Campaign, 841 F.2d 1176, 1179 (1st Cir. 1988).

**A.      Enforceability**

In response to the district court's show cause order, NITHPO contended unsuccessfully that the district court could not enforce a subpoena issued by a defunct grand jury. NITHPO raises the same argument in this appeal, averring that civil contempt sanctions for noncompliance with a subpoena cannot be imposed

4

beyond the life of the grand jury under whose aegis the subpoena was issued. The government in turn suggests that civil contempt sanctions are keyed to the life of the grand jury for which the contempt order was issued -- here, the grand jury empanelled on April 16, 2013. The parties' arguments rest on divergent interpretations of the applicable statute and caselaw, to which we presently turn.

We have described the federal courts' contempt power as "one of the most potent weapons in the judicial armamentarium." Project B.A.S.I.C., 947 F.2d at 16. Although that authority was not codified until 1970, civil contempt sanctions "have been employed against recalcitrant grand jury witnesses since the earliest days of the federal courts." Douglas C. Berman, Note, Coercive Contempt and the Federal Grand Jury, 79 Colum. L. Rev. 735, 735, 740 (1979); see also, e.g., Gompers v. Buck's Stove & Range Co., 221 U.S. 418, 442 (1911). Unlike criminal contempt sanctions, "incarceration for civil contempt is not for the purpose of punishing recalcitrant respondents but rather is the modern 'persuasive' tool that is used in substitution of the barbaric placing of stones on the subject's chest, which was formerly used to literally press the recipient into submission." United States v. Marquardo, 149 F.3d 36, 39 (1st Cir. 1998). An imprisoned civil contemnor is therefore said to "carr[y] the keys of his prison in his own pocket." Gompers, 221 U.S. at 442

5

(internal quotation marks omitted).  In keeping with this coercive function, courts have long recognized that civil contempt sanctions are necessarily limited to the period in which the contemnor can unlock the figurative prison door by purging himself of contempt.  See, e.g., Shillitani v. United States, 384 U.S. 364, 371-72 (1966); Marquardo, 149 F.3d at 39-40; In re Grand Jury Proceedings (Caucus Distribs., Inc.), 871 F.2d 156, 161-62 (1st Cir. 1989); United States v. Levine, 288 F.2d 272, 274 (2d Cir. 1961); Loubriel v. United States, 9 F.2d 807, 809 (2d Cir. 1926) (L. Hand, J.); United States v. Collins, 146 F. 553, 554 (D. Or. 1906).

In Shillitani, involving two consolidated cases in which the district courts ordered recalcitrant grand jury witnesses imprisoned until they purged their contumacy or until two years had passed, the Supreme Court held that the two-year period of confinement was inappropriate to the extent that it exceeded the term of the sitting grand jury.  As the Court explained,

> the justification for coercive imprisonment as applied to civil contempt depends upon the ability of the contemnor to comply with the court's order.  Where the grand jury has been finally discharged, a contumacious witness can no longer be confined since he then has no further opportunity to purge himself of contempt.  Accordingly, the contempt orders . . . were improper insofar as they imposed sentences that extended beyond the cessation of the grand jury's inquiry into petitioners' activities.  Having sought to deal only with civil contempt, the District Courts lacked authority to imprison petitioners for a period longer than the term of the grand jury. . . . Once the grand jury ceases to function, the

6

> rationale for civil contempt vanishes, and the contemnor has to be released.

384 U.S. at 371-72 (citation and footnote omitted).  Shillitani did, however, leave open the possibility of reiterative contempt sanctions before successive grand juries: the Court explained in a footnote that although any given period of confinement for civil contempt could not last beyond the term of the sitting grand jury, "sentences of imprisonment may be continued or reimposed if the witnesses adhere to their refusal to testify before a successor grand jury."  Id. at 371 n.8.

Four years after the Supreme Court's decision in Shillitani, Congress enacted Title III of the Organized Crime Control Act, Pub. L. No. 91-452, 84 Stat. 922, 932 (1970) (codified at 28 U.S.C. § 1826), in an endeavor to "codify present civil contempt practice with respect to recalcitrant witnesses in federal grand jury and court proceedings," H.R. Rep. No. 91-1549, at 4008 (1970).[3]  Section 1826(a) provides:

> Whenever a witness in any proceeding before or ancillary to any court or grand jury of the United States refuses without just cause shown to comply with an order of the court to testify or provide other information, including any book, paper, document, record,

---

[3] Representative Poff, a House sponsor of the legislation, stressed its consistency with the traditional limitations on civil contempt recognized in Shillitani: "[U]pon the termination of the proceedings at which the witness was ordered to testify, the witness is entitled to his release because he could no longer obey the court's order if he wished to do so."  116 Cong. Rec. 35291 (1970).

recording or other material, the court, upon such refusal, or when such refusal is duly brought to its attention, may summarily order his confinement at a suitable place until such time as the witness is willing to give such testimony or provide such information. No period of such confinement shall exceed the life of--

> (1) the court proceeding, or
> (2) the term of the grand jury, including extensions,

before which such refusal to comply with the court order occurred, but in no event shall such confinement exceed eighteen months.

The parties dispute the significance of both Shillitani and § 1826(a) in this case. Their sharpest dissensus, however, concerns the import of our holding in Caucus Distributors, in which we relied on both Shillitani and § 1826(a) to hold that civil contempt fines could not extend "beyond the life of the original grand jury" and into the term of a successor grand jury. 871 F.2d at 161. Our holding rested on Shillitani's conclusion that the justification for coercive civil contempt vanishes when the contemnor can no longer purge himself:

> Perhaps our most significant difficulty lies in contemplating how, when witnesses have been subpoenaed, as here, both 'to appear . . . to testify' and to bring documents to a specific grand jury and that jury has been discharged, a court would handle attempts to purge. . . . [A] court would be placed in the anomalous position of determining whether the response of a witness in supplying or failing to supply documents facilitated or frustrated the work of a grand jury that no longer existed. . . . Particularly since it would be relatively simple -- and clear cut -- for a successor grand jury to reimpose coercive

8

>     sanctions, we prefer not to enter this
>     thicket.

Id. at 162.

The government suggests that Caucus Distributors is distinguishable from this case in that both the underlying subpoena and the subsequent contempt order were issued during the term of the first grand jury. In its estimation, the "original" grand jury contemplated in Caucus Distributors is the one before which the subpoena was enforced via contempt sanctions (here, the still-empanelled second grand jury); NITHPO, by contrast, implies that Caucus Distributors instead focused on the grand jury under whose auspices the underlying subpoena was issued in the first place (here, the defunct first grand jury).

We find Caucus Distributors inconclusive on this point. Moreover, although the government highlights the language of § 1826(a) limiting confinement to "the term of the grand jury . . . before which such refusal to comply with the court order occurred," we conclude that § 1826(a) also does not address the precise question presented in this case. The issue before us is not the proper duration of the contempt order imposed during the second grand jury's term, but rather whether that contempt order, based on NITHPO's failure to comply with a previous grand jury's subpoena, was properly issued at all.

The government's position is not without some support in the caselaw. Confronted with a case similar to this one, in which

9

an initial grand jury issued a subpoena duces tecum and the district court granted the government's motion to compel compliance during the term of a successor grand jury, the D.C. Circuit distinguished our holding in Caucus Distributors and held that the first grand jury's subpoena could be enforced during the term of the successor grand jury. In re Sealed Case, 223 F.3d 775, 778 (D.C. Cir. 2000). In the D.C. Circuit's view, because the successor grand jury had "indisputably carried the investigation forward," the concerns that we had stated in Caucus Distributors about determining "when an investigation has ceased" were not implicated. Id. (citing Caucus Distribs., 871 F.2d at 161) (internal quotation marks omitted).

The D.C. Circuit, like the government on this appeal, also pointed to our observation in Caucus Distributors that "a subpoena issued by one grand jury may be used to obtain evidence for a second grand jury." Caucus Distribs., 871 F.2d at 160 (citing In re Grand Jury Proceedings (Sutton), 658 F.2d 782, 783 (10th Cir. 1981) (upholding a district court order commanding delivery of documents subpoenaed by an expired grand jury)). That isolated sentence, however, cannot bear the weight placed upon it. Because the government in Caucus Distributors did not move to compel compliance before the second grand jury, we did not have occasion, as we do now, to determine the enforceability of the first grand jury's subpoena before a successor grand jury. Indeed,

10

we cited <u>Sutton</u> for this proposition only in describing the underpinning of the government's unsuccessful argument in <u>Caucus Distributors</u>. As an "observation[] . . . not essential to the determination of the legal questions then before the court," this statement is therefore non-binding dicta. <u>Arcam Pharm. Corp.</u> v. <u>Faría</u>, 513 F.3d 1, 3 (1st Cir. 2007) (internal quotation marks omitted); <u>see</u> <u>also</u> <u>Dedham Water Co., Inc.</u> v. <u>Cumberland Farms Dairy, Inc.</u>, 972 F.2d 453, 459 (1st Cir. 1992).[4]

To the extent that <u>Sutton</u> and <u>Sealed Case</u> approve the use of the contempt power in the circumstances now before us, we disagree with those decisions. Such a rule, allowing the imposition of contempt sanctions even where a contemnor is unable to purge himself of contumacy before the subpoenaing grand jury, would vitiate the coercive rationale for civil contempt. The

---

[4] The government also points to cases in which we have held that the government can transfer materials presented before one grand jury to a successor grand jury. <u>See</u>, <u>e.g.</u>, <u>In re United States</u>, 441 F.3d 44, 63 (1st Cir. 2006); <u>United States</u> v. <u>Contenti</u>, 735 F.2d 628, 631 n.1 (1st Cir. 1984). These cases are not germane to the question presented here, however, as they address whether evidence <u>already</u> <u>obtained</u> by the first grand jury is transferable to the second grand jury, not whether the second grand jury can obtain new evidence by enforcing its predecessor's subpoena.

We also find distinguishable the Fifth Circuit's decision in <u>United States</u> v. <u>Stevens</u>, 510 F.2d 1101, 1106 (5th Cir. 1975). Although <u>Stevens</u> upheld a civil contempt order based on the appellant's noncompliance with a previous grand jury's subpoena, the first grand jury's subpoena had expressly ordered the appellant to testify before the <u>second</u> grand jury after its empanelment. <u>Stevens</u> therefore addressed the distinct question of whether the first grand jury was authorized to order the appellant's "appearance before a grand jury not yet empanelled." <u>Id.</u> at 1104.

11

second grand jury may have taken up the investigation, but the subpoena was issued in the name of, and ordered the production of records before, the <u>first</u> grand jury at a specified date and time. As Judge Hand stated in <u>Loubriel</u>, NITHPO's "duty [to testify] . . . was measured by the subpoena, the only process under which [NITHPO] could be required to appear and to testify at all."  9 F.2d at 809. That subpoena "did not require [NITHPO's] attendance before any other than the [October 2012] grand jury."  <u>Id.</u>; <u>see</u> <u>also</u> <u>In re Grand Jury, August, 1965 (McClintock Merchantile Co.)</u>, 360 F.2d 917, 918 (7th Cir. 1966) (finding "no basis for anxiety that the respondent can be required to appear . . . before some other grand jury" under a subpoena "direct[ing] attendance on a certain day, at a certain hour, before the August term, 1965 of the grand jury"). It follows as a matter of logic that NITHPO could only comply with the subpoena so long as the issuing grand jury was in existence.

In this case, the subpoenaing grand jury was dead to begin with.[5]  It had expired even before the government moved to compel compliance with its subpoena.  The district court's order granting the motion to compel therefore ran afoul of the maxim "<u>lex non cogit ad impossibilia</u>" -- literally, "[t]he law does not compel to impossible ends,"[6] <u>Black's Law Dictionary</u> 1844 (9th ed. 2009).

---

[5] <u>Cf.</u> Charles Dickens, <u>A Christmas Carol</u> (1843).

[6] This principle is discussed more thoroughly in Herbert Broom, <u>A Selection of Legal Maxims</u> 237-46 (6th ed. 1884).  It is perhaps most familiarly embodied in the common-law contractual

12

See <u>Collins</u>, 146 F. at 554. NITHPO could not produce documents before a grand jury that no longer existed, and therefore "could, of course, be no longer compelled to discharge a duty which had ended." <u>Loubriel</u>, 9 F.2d at 809; <u>see</u> <u>also</u> <u>In re Grand Jury Proceedings, Thursday Special Grand Jury Sept. Term, 1991</u>, 33 F.3d 342, 347 (4th Cir. 1994) ("The subpoenas issued by the September Term 1991 grand jury . . . clearly do not have force as a result of the expiration of that grand jury."); <u>accord</u> <u>In re Special Investigation No. 195</u>, 454 A.2d 843, 846 (Md. 1983) ("The grand jury was dead. There was no one to whom the subpoena was returnable. . . . It thus was impossible to enforce the subpoena.").

The impossibility of compliance in turn left NITHPO unable to purge itself of contempt. The proverbial key in NITHPO's pocket fit a lock that no longer existed. <u>Cf.</u> <u>Gompers</u>, 221 U.S. at 442. We accordingly take guidance from <u>Shillitani</u>'s dictate that civil contempt sanctions are inappropriate when a contemnor "has no further opportunity to purge himself of contempt." 384 U.S. at

---

doctrine of impossibility, which excuses a party's contractual performance "[w]here the means of performance have been nullified, making performance objectively impossible." 30 <u>Williston on Contracts</u> § 77:25 (4th ed. 2013); <u>see</u> <u>also</u>, <u>e.g.</u>, <u>Taylor</u> v. <u>Caldwell</u>, 122 E.R. 309, 314 (K.B. 1863) ("The principle seems to us to be that, in contracts in which the performance depends on the continued existence of a given person or thing, a condition is implied that the impossibility of performance arising from the perishing of the person or thing shall excuse the performance."); <u>The Tornado</u>, 108 U.S. 342, 351 (1883) (applying rule of <u>Taylor</u>).

13

371. Because it was impossible for NITHPO to purge itself of contempt, the contempt order served no coercive purpose and was therefore improperly entered. See Loubriel, 9 F.2d at 809 (following discharge of the subpoenaing grand jury, appellant "could not be lawfully detained thereafter, merely to compel compliance with the subpoena"); Sara Sun Beale et al., Grand Jury Law and Practice § 11:17 (2d. ed. 2013) ("[T]he witness's confinement cannot last longer than the session of the grand jury before which the witness was subpoenaed, because the termination of the grand jury's session ends the witness's ability to comply with the court's order, and thus ends the possible coercive effect of the civil contempt sanction."); see also Levine, 288 F.2d at 274.

In parting, we note that the government has argued that this conclusion would establish "an arbitrary and formalistic rule requiring reissuance of subpoenas upon each transfer between grand juries," which "merely creates a trap for the unwary prosecutor and an incentive for would-be contemnors to engage in delaying tactics, as happened here." Of concern to us, however, is that the government's proposed alternative -- allowing reiterative civil contempt sanctions before future grand juries based on noncompliance with an old subpoena -- would render the grand jury subpoena process all but meaningless. Particularly since we and other courts have long recognized that a prosecutor may simply "obtain subpoenas issued in blank by the court, fill in the blanks,

14

and have the witnesses served without consulting the grand jury," In re Melvin, 546 F.2d 1, 5 (1st Cir. 1976) -- a point that the government itself stresses on this appeal -- we see no great administrative difficulty in requiring, as a precondition to the use of coercive contempt power, the issuance of a new subpoena for each new grand jury. If the current grand jury or a successor desires information from a recalcitrant NITHPO, the government need do no more than obtain a new, enforceable subpoena. That is a small price to pay for access to "one of the most potent weapons in the judicial armamentarium." Project B.A.S.I.C., 947 F.2d at 16.

## B.    Tribal Sovereign Immunity

Although our holding that the expired grand jury's subpoena was unenforceable would ordinarily render NITHPO's remaining challenges moot, this case falls within the "capable of repetition yet evading review" exception to the mootness doctrine. As formulated by the Supreme Court, the exception applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." Weinstein v. Bradford, 423 U.S. 147, 149 (1975); see also, e.g., ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 57 (1st Cir. 2013). Both criteria are satisfied here. First, the current grand jury is continuing its predecessor's investigation and, in light of our

15

holding today, can reasonably be expected to issue a new subpoena to NITHPO. Second, according to the government's brief, the current grand jury is presently set to expire in April 2014, leaving too short a period of time to fully litigate a new subpoena's validity. See Thursday Special Grand Jury Sept. Term, 1991, 33 F.3d at 347 (finding an expired grand jury's subpoenas unenforceable, but holding that appellants' objections to the subpoenas' validity were capable of repetition yet evading review); see also In re Sealed Case, 877 F.2d 976, 981 n.6 (D.C. Cir. 1989). We therefore turn to NITHPO's argument that, as a branch of the Narragansett Indian Tribe, it was immune to subpoena.

Proceeding on the assumption that NITHPO is an arm of the Narragansett Indian Tribe whose sovereign immunity is coextensive with that of the tribe (a premise that the government does not dispute on appeal), the district court nevertheless determined that tribal sovereign immunity did not operate as a bar to the grand jury's subpoena power. On appeal, NITHPO assigns error to that conclusion, arguing that the subpoena "constitute[d] a nonpermissible intrusion into the internal affairs of a federally recognized tribe, and thus, [that] its enforcement would violate tribal sovereign immunity."

The Supreme Court has described Indian tribes as "unique aggregations possessing attributes of sovereignty over both their members and their territory," Montana v. United States, 450 U.S.

16

544, 563 (1981) (internal quotation marks omitted), including sovereign immunity from suit, see Kiowa Tribe of Okla. v. Mfg. Techs., Inc., 523 U.S. 751, 754 (1998). Nevertheless, the Court has been "careful to note that, through their original incorporation into the United States as well as through specific treaties and statutes, the Indian tribes have lost many of the attributes of sovereignty." Montana, 450 U.S. at 563; see also Washington v. Confederated Tribes of Colville Indian Reservation, 447 U.S. 134, 154 (1980) ("[T]ribal sovereignty is dependent on, and subordinate to, [] the Federal Government . . . ."); United States v. U.S. Fid. & Guar. Co., 309 U.S. 506, 512 (1940) ("It is as though the immunity which was [the tribes'] as sovereigns passed to the United States for their benefit, as their tribal properties did.").

Other circuits have accordingly recognized the United States as a superior sovereign from whose suits the tribes enjoy no sovereign immunity, see, e.g., Miccosukee Tribe of Indians of Fla. v. United States, 698 F.3d 1326, 1331 (11th Cir. 2012); Reich v. Mashantucket Sand & Gravel, 95 F.3d 174, 182 (2d Cir. 1996); Quileute Indian Tribe v. Babbitt, 18 F.3d 1456, 1459 (9th Cir. 1994); United States v. Red Lake Band of Chippewa Indians, 827 F.2d 380, 382-83 (8th Cir. 1987); United States v. Yakima Tribal Court, 806 F.2d 853, 861 (9th Cir. 1986); United States v. White Mountain Apache Tribe, 784 F.2d 917, 920 (9th Cir. 1986), even where

17

Congress has not specifically abrogated the tribes' immunity, see EEOC v. Peabody W. Coal Co., 400 F.3d 774, 781 (9th Cir. 2005). Even assuming arguendo that the enforcement of a subpoena represents a "suit" against a tribe for purposes of sovereign immunity (a premise that the government contests), we find no reason to depart from this bedrock principle, and accordingly conclude that tribal sovereign immunity provides no refuge from the subpoena power of a federal grand jury.

For the sake of completeness, we further note that, even if the tribes did originally enjoy sovereign immunity from federal grand jury process, Congress has abrogated that immunity through the enactment of federal criminal statutes extending to Indian country "the general laws of the United States as to the punishment of offenses committed in any place within the sole and exclusive jurisdiction of the United States." 18 U.S.C. § 1152; see also id. § 1153 (establishing federal jurisdiction over major crimes committed in Indian country). That grant of criminal jurisdiction necessarily entails the authorization of investigative and enforcement mechanisms such as the grand jury subpoena power. See In re Long Visitor, 523 F.2d 443, 446-47 (8th Cir. 1975) ("[T]he extension by Congress of federal jurisdiction to crimes committed on Indian reservations inherently includes every aspect of federal criminal procedure applicable to the prosecution of such crimes."); United States v. Boggs, 493 F. Supp. 1050, 1054 (D. Mont. 1980)

18

(stating that tribal sovereign immunity from grand jury process would render Indian criminal statutes "almost universally unenforceable"); cf. Narragansett Indian Tribe v. Rhode Island, 449 F.3d 16, 22, 26-27 (1st Cir. 2006) (en banc) (holding that the Narragansett Tribe waived its sovereign immunity from the execution of a state search warrant by entering into a land claims settlement providing that "all laws of the State of Rhode Island shall be in full force and effect on the settlement lands").

## C. Reasonableness

NITHPO lastly argues that the district court should have quashed the subpoena as unreasonably broad and burdensome. Fed. R. Crim. P. 17(c)(2) authorizes a district court to quash or modify a subpoena "if compliance would be unreasonable or oppressive." A subpoena is presumed to be reasonable, and the recipient bears the burden of establishing its unreasonableness. United States v. R. Enters., Inc., 498 U.S. 292, 301 (1991).

As modified by the district court, the subpoena duces tecum seeks fifteen categories of documents spanning a five-year period, including, inter alia, contracts and correspondence between NITHPO and government entities, payroll records and documents concerning NITHPO employees and contractors, and meeting minutes. Citing United States v. Gurule, 437 F.2d 239, 241 (10th Cir. 1970), for the threefold proposition that "(1) the subpoena may command only the production of things relevant to the investigation being

19

pursued; (2) specification of things to be produced must be made with reasonable particularity; and (3) production of records covering only a reasonable time may be required," NITHPO avers that the subpoena duces tecum is deficient under the latter two prongs, neither specifying the documents to be produced with "reasonable particularity" nor "covering only a reasonable time."

District courts might indeed reach divergent conclusions as to the reasonableness of this subpoena, but that is not the standard of review on appeal. Reviewing only for abuse of discretion, see LaRouche Campaign, 841 F.2d at 1179, we think that the denial of NITHPO's Rule 17(c)(2) motion fell within the wide bourn of the district court's discretion.[7] NITHPO ultimately does little more than enumerate the categories of requested documents and generally protest "[t]he sheer amount of time and resources that would be required to comply" with the subpoena duces tecum. But all subpoenas demand some amount of time and resources from their recipients, and absent a more specific explanation of how the burden in this case is unreasonable, we decline to disturb the district court's judgment. Cf. In re Grand Jury Proceedings, 115

---

[7] Given the standard of review, the two appellate cases on which NITHPO relies, United States v. Wencke, 604 F.2d 607, 612 (9th Cir. 1979), and Margoles v. United States, 402 F.2d 450, 451–52 (7th Cir. 1968), are crucially distinguishable in that they merely held that quashing a subpoena was within the district court's discretion. That alone does not compel the converse conclusion that the refusal to quash would have been an abuse of discretion.

F.3d 1240, 1244 (5th Cir. 1997) (holding that subpoena recipients failed to establish unreasonableness by "[s]imply citing the types of information sought by the government").

As a last effort, NITHPO also reintroduces its tribal sovereign immunity argument in new garb, suggesting that "[w]hat constitutes an unreasonable intrusion into the workings of an entity is certainly different . . . when that entity is a sovereign nation that has recognized protections from interference with internal tribal matters."  We decline NITHPO's invitation to graft sovereign immunity considerations onto Rule 17(c)(2), and in any event, this assertion lacks force in light of our conclusion in section B supra.

### III.

For the foregoing reasons, we conclude that the subpoena duces tecum was unenforceable after the expiration of the issuing grand jury.  We therefore **vacate** the district court's order holding NITHPO in civil contempt.  In the event a subpoena similar in scope is subsequently issued and NITHPO again challenges its validity, our holdings on tribal sovereign immunity and reasonableness of the subpoena shall apply to any such proceeding.